AFFILIATED CAPITAL CORPORA-
TION, et al., Plaintiffs,

v.

CITY OF HOUSTON, et al., Defendants.

Civ. A. No. H–79–1331.

United States District Court,
S. D. Texas,
Houston Division.

July 7, 1981.

---

Charles J. Brink, Houston, Tex., for plaintiffs.

Stephen D. Susman, Susman & McGowan, Houston, Tex., for plaintiffs.

Rufus Wallingford, Fulbright & Jaworski, Houston, Tex., for defendants City of Houston and Mayor McConn.

Richard B. Miller, Baker & Botts, Houston, Tex., for defendant Gulf Coast Cable Television.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

### I. The Pending Motions and The Court's Ruling

Various post-trial motions are pending before the Court: (1) plaintiff's Motion for Injunctive Relief and for Entry of Judgment in Accordance with the Verdict; (2) defendant McConn's Motion for Judgment on the Verdict; (3) defendant Gulf Coast's Alternative Motions for Judgment on the Verdict, Judgment Notwithstanding the Verdict or for New Trial; and (4) defendants City of Houston's and McConn's Motion for Judgment Notwithstanding the Verdict. Having considered the record of this case, the issues addressed in the memoranda, and the arguments of counsel, the Court rules as follows with regard to the motions: (1) plaintiff's motion should be denied in its entirety; (2) defendants' motions for judgment on the verdict or for new trial should be denied; and (3) defendants' motions for judgment notwithstanding the verdict should be granted.[1]

In this complex and protracted anti-trust case which resulted in a jury verdict for the plaintiff, the instant rulings by the Court are necessarily expanded upon at length in light of the trial record to explain the reasoning utilized in reaching a decision adverse to plaintiff. The issues basically revolve around the meaning of two of the jury's answers to interrogatories propounded at the close of the evidence and the Court's obligation under the law at this stage of the trial to uphold the verdict if supported by the record. While persuaded that the plaintiff's proof can be viewed as advancing a second theory of conspiracy to limit competition for cable franchises separate and apart from the boundary agreements, this Court finds no evidence apart from the boundary agreements of a conspiracy which caused harm to plaintiff. Since the jury found such boundary agreements were not part of a conspiracy in unreasonable restraint of trade, the necessary nexus between a conspiracy and plaintiff's failure to receive a cable franchise is lacking. Accordingly, the defendants must prevail, and a judgment notwithstanding the jury verdict in their favor will be granted.

### II. The Contentions of the Parties

The jury was instructed that in order to find that any of the defendants violated Section 1 of the Sherman Act, they had to find the following essential elements by a preponderance of the credible evidence:

(1) that the particular defendant entered into a conspiracy or agreement with one or more other persons; and

1. Plaintiff also has filed a motion for leave to file a second amended complaint, in which the only new allegations are those related to plaintiff's standing as a consumer within the Gulf Coast franchise area to seek injunctive relief against Gulf Coast. Inasmuch as the conclusions reflected in this Order render plaintiff's standing as a consumer a moot issue, the Court hereby denies that motion.

(2) that the object of this conspiracy or agreement was to divide and allocate territories and thereby eliminate plaintiff or others as competitors for cable television franchises in Houston; or that the object of this conspiracy was to limit competition to those persons who participated in the agreement.

Instruction No. 12, Jury Charge.

Further, they were instructed as follows:

It is established that Gulf Coast agreed to divide or allocate the territories within which certain cable television companies would apply for a franchise, specifically with the Houston Cable and Westland groups. The question for you to determine is whether such agreements were made as part of a conspiracy which constituted an unreasonable restraint of trade which had a substantial adverse effect on competition. Also with regard to Gulf Coast, you must determine whether Gulf Coast engaged in a conspiracy with one or more other persons to limit competition for cable television franchises in Houston. If you determine that Gulf Coast entered such a conspiracy, you must determine whether that conspiracy constituted an unreasonable restraint of trade.

With regard to the City of Houston and Mayor McConn, if you determine from a preponderance of the evidence that either of those defendants participated in or acted in furtherance of a conspiracy to divide or allocate the territories within which the cable television companies would apply for a franchise with the purpose of excluding plaintiff from a franchise, or of a conspiracy to limit competition for cable television franchises, you must next determine whether such alleged conspiracy constituted an unreasonable restraint of trade, which had a substantial adverse effect on competition.

Instruction No. 17, Jury Charge.

In conformity with the instructions, two interrogatories concerning liability on separate conspiracy theories, one specifically related to boundary agreements and one related to a conspiracy independent of those agreements, were submitted to the jury. The first interrogatory encompassed the issue of whether the established boundary agreements were part of an illegal conspiracy,[2] and the jury responded with a negative answer. The third interrogatory encompassed the issue of whether any of the defendants participated in an illegal conspiracy to ensure that only co-conspirators would receive franchises,[3] and the jury responded affirmatively, finding that defendants Gulf Coast, City of Houston and Jim McConn participated.[4] The jury then found causation and damages in affirmative answers to Interrogatories Nos. 5 and 6.

**2.** That interrogatory provides, in its entirety, as follows:

### PLAINTIFF'S BURDEN OF PROOF
### INTERROGATORY NO. 1

It is established that two or more franchise applicants, including defendant Gulf Coast, participated in agreements on boundary lines so as to divide the geographic areas for which these applicants would seek cable television franchises. Do you find from a preponderance of the credible evidence that these agreements were part of a conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act? Answer "yes" or "no".

ANSWER: ___No___

If you have answered Interrogatory No. 1 "yes", answer Interrogatory No. 2. If you have answered Interrogatory No. 1 "no", answer Interrogatory No. 3.

**3.** That interrogatory provides, in its entirety, as follows:

### INTERROGATORY NO. 3

Do you find from a preponderance of the credible evidence that one or more of the defendants participated in a conspiracy in unreasonable restraint of trade to limit competition for cable television franchises, in violation of Section 1 of the Sherman Act? Answer "Yes" or "No".

ANSWER: ___Yes___

If you have answered Interrogatory No. 3 "yes", answer Interrogatory No. 4. If you have answered Interrogatory No. 3 "no", answer Interrogatory No. 5.

**4.** Before the case was submitted to the jury, all defendants proposed that Interrogatories 1 and 3 be combined in a single question. Plaintiff objected on the ground that combining the two questions materially would alter plaintiff's theory of the case.

Defendant Gulf Coast contends that it is entitled to judgment based on the negative answer to Interrogatory No. 1, for the following reasons:

(1) Given the finding that the boundary agreements were not part of an unlawful conspiracy, there is no evidence to support an affirmative answer to Special Interrogatory 3;

(2) The finding that the boundary agreements were not part of an unlawful conspiracy precludes an affirmative answer to Special Interrogatory 5—that an unlawful conspiracy proximately caused injury to plaintiffs' business or property—since there is no evidence of any unlawful conspiracy contributing to plaintiffs' failure to obtain a franchise other than testimony linking the boundary agreements with such failure; and

(3) The finding that the boundary agreements were not part of an unlawful conspiracy resolves all arguments against the applicability of *Noerr-Pennington* to the facts of this case and renders that doctrine controlling as a matter of law.

Defendants City of Houston and McConn contend that they are entitled to judgment on the following grounds, *inter alia*:

I. In light of the jury's answer to Special Interrogatory No. 1, there is no evidence to support the jury's answers to Special Interrogatories Nos. 3 and 5. . . .

II. In light of the jury's answer to Special Interrogatory No. 1, the evidence is conclusive that all other actions of the Mayor and the City of Houston were within the scope of the legislative process, and are exempted from antitrust liability. . . .

 Plaintiff asserts that it has never taken the position that the boundary agreements simply were a more specific and all-inclusive description of the conspiracy to limit competition. Instead, plaintiff's theory throughout the course of proceedings was that "the boundary agreements were illegal standing alone [5] as well as being part of the conspiracy to limit competition", and plaintiff asserts that the boundary agreements "were not the only acts that [it] put in evidence to establish the existence of a conspiracy to limit competition." [6] Plaintiff characterizes the conspiracy addressed in Interrogatory No. 3 as one in which the "co-conspirators agreed to limit competition from non-conspirators, including plaintiff . . . , [and agreed] to limit competition with each other." [7]

**5.** Plaintiff had requested a *per se* instruction on the boundary agreements, which the Court concluded could not be submitted to the jury.

**6.** The Court cannot agree with plaintiff's characterization of the jury's answer to Interrogatory No. 1 as a finding only "that plaintiff had not proved by a preponderance of the evidence that *two* agreements on boundary lines were part of a conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act." (emphasis added). Neither Instruction No. 17, refer to pp. 995–996, *supra*, nor Interrogatory No. 1, refer to note 2, *supra*, was phrased to include exclusively Gulf Coast's agreements with Houston Cable and Westland. The jury was instructed to determine whether "such" agreements on boundary lines were part of a conspiracy, and the Court is persuaded that the intent of the jury instructions as well as that of the jury in responding to Interrogatory No. 1, was that all agreements to allocate and divide territories which were made among franchise applicants were encompassed by the language of the inquiry relating thereto. Accordingly, the Court concludes that the jury found that plaintiff had failed to prove that any boundary agreements which were made among applicants were part of an illegal conspiracy.

**7.** In discussing the differences in the two liability interrogatories, and the necessity of submitting separate questions, plaintiff observes that, "The jury . . . [was] asked whether [the boundary agreements] were proven to be part of a conspiracy in restraint of trade, and they said "no," while at the same time determining that there *was* a conspiracy in restraint of trade." Defendant Gulf Coast's analysis of the jury's answers to the two interrogatories provides an explanation of the jury's intent in so answering:

Thus the jury must have concluded that the boundary agreements were not part of a conspiracy in unreasonable restraint of trade 'to limit competition for cable television franchises.' Nevertheless, they answered the *third interrogatory in the affirmative*, apparently believing there was some conduct wholly unrelated to the boundary agreements which was legally cognizable as a conspiracy in unreasonable restraint of trade to limit competition for cable franchises.

The Court agrees with plaintiff that "Special Verdict 1 is a narrower, not a more precise,

## III. The Test for Sufficiency of the Evidence and The Relevant Proof

On motions for ... judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, .... The motions for ... judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict.

*Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (*en banc*); *accord,*

*Bazile v. Bisso Marine Company,* 606 F.2d 101, 104 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 101 S.Ct. 94, 66 L.Ed.2d 33 (1981). Pursuant to the Court's obligation to implement that standard, the Court carefully has reviewed documentary evidence and testimony in the light most favorable to plaintiff, and has analyzed comprehensively the plaintiff's assertions regarding the inferences to be drawn therefrom.

The Court concludes that with regard to liability of defendants for a conspiracy to limit competition of non-conspirators and to limit competition among co-conspirators, that is, whether such a conspiracy existed independent of the boundary agreements and whether defendants Gulf Coast, City of Houston and McConn participated in it, substantial evidence exists in the record to create a likelihood that reasonable persons could reach different conclusions. With regard to evidence of a causal relationship between that conspiracy and plaintiff's failure to be awarded the franchise for which it applied, however, the record presents insufficient evidence, and the Court concludes that reasonable persons could not decide otherwise. Accordingly, the Court finds

inquiry than Special Verdict 3," and remains of the opinion that submission of separate liability interrogatories was not only necessary for consistency with the plaintiff's theory that the boundary agreements were part of a conspiracy but were not intended to constitute an all-inclusive and exclusive description of the conspiracy, but was compelled by an evaluation of the evidence which had been presented to the jury. *See Boeing Company v. Shipman,* 411 F.2d 356, 374–75 (5th Cir. 1969) (*en banc*) ("A mere scintilla of evidence is insufficient to present a question for the jury.... There must be a conflict in substantial evidence to create a jury question."). Further, the Court concludes that, on the basis of the evidence which was presented to the jury, the interrogatories were constructed to avoid answers which would create irreconcilable conflict and, in fact, the answers present no such conflict. Accordingly, the Court declines to treat Gulf Coast's alternative motion as one for new trial.

The Court is required to " 'search for a view of the case that makes the jury's answers consistent.' ... Even if a conflict exists, [the Court] must inquire whether the inconsistency can nonetheless be read as 'a consistent expression of intent that [defendants are] either liable or excluded from liability.' " *Special Promo-*

*tions, Inc. v. Southwest Photos, Ltd.,* 559 F.2d 430, 432 (5th Cir. 1977), *quoting Gonzales v. Missouri R. R. Co.,* 511 F.2d 629, 633 (5th Cir. 1975) *and Griffin v. Matherne,* 471 F.2d 911, 916 (5th Cir. 1973). This Court perceives no difficulty in viewing the answers to interrogatories 1 and 3 as a consistent expression of intent that defendants are liable for participation in a conspiracy to limit competition, notwithstanding that the boundary agreements were not part of the conspiracy. As is reflected in the analysis at 1005–1010, *infra,* the deficiency arises in the sufficiency of evidence to support a finding that said conspiracy was causally related to plaintiff's injury.

Additionally, the Court observes that it is unpersuaded by defendants' assertions that plaintiff raises new, previously unpled, theories by its assertion that the conspiracy of Interrogatory No. 3 encompassed an illegal agreement to exclude non-conspirators from competition, and to limit the competition among co-conspirators. Review of Plaintiff's First Amended Complaint at ¶ 38 & ¶ 39, and plaintiff's Joint Pretrial Order of January 12, 1981, at 11–14, indicates that plaintiff espoused its theory of the case consistently throughout the course of proceedings.

that the absence of evidence of causation cannot support a verdict in plaintiff's favor based on an affirmative answer to Interrogatory No. 5.

## A. The Issue of Liability

■■■■ The Court agrees with plaintiff that the jury's affirmative answer to Interrogatory No. 3 reflects its "apparent conclusion that the conspiracy to limit competition was an agreement or understanding that franchises would be awarded only to those applicants that were approved by Gulf Coast and other nondefendant participants", and with defendant Gulf Coast that "apparently [the jurors believed that] there was some conduct wholly unrelated to the boundary agreements which was legally cognizable as a conspiracy in unreasonable restraint of trade to limit competition for cable franchises." As defendants have contended, plaintiff focused throughout the case on the boundary agreements and the negotiations surrounding them, as is apparent from plaintiff's pleadings and proof.[8] The jury's rejection of plaintiff's predominant theory, however, will not suffice to resolve the question of whether proof exists in the record to support a theory which plaintiff espoused but did not emphasize.

In Plaintiff's Brief Demonstrating Inferences from the Evidence, plaintiff identifies many excerpts from the testimony as well as related documentary evidence from which inferences can be drawn to support the existence of a separate theory of conspiracy to limit competition that is not contingent upon evidence concerning boundary agreements. Plaintiff has reached the correct result in its analysis of the evidence. The Court has determined, however, that some of the proof identified by plaintiff is inappropriate for consideration because that evidence relates solely to boundary agreements encompassed in Interrogatory No. 1.

In order to demonstrate clearly the evidence apart from that of boundary agreements which tends to show the existence of, and acts done in furtherance of, a conspiracy to exclude non-conspirators and to limit competition among co-conspirators, the Court feels obligated to set forth a summary of the history of the franchise process followed in Houston and a detailed recitation of the evidence which demonstrates that the conspiracy encompassed in Interrogatory No. 3 existed.

### 1. History of Franchising Process

Between July 1978 and August 1978 several applications for cable television franchises were filed with the City: Gulf Coast, the first; Houston Cable; Meca; Houston Community Cable; and G. B. Communications. In September 1978, Westland also made application, and plaintiff, Affiliated Capital, having divested itself of ownership of a savings and loan association and thereby becoming eligible to apply for a franchise, hired an attorney to assist it in obtaining a franchise. In October 1978, the City hired a consultant, Robert Sadowski, to evaluate the applications; the consultant's employment was terminated in November, 1978. Also in October, plaintiff announced by letter to City Council its intention to apply for a franchise, and in November, City Council sent to plaintiff an application form. Plaintiff filed its application on November 16, 1978, and filed a supplemental application on November 28, 1978. The November 29, 1978 City Council agenda contained six cable television ordinances: Gulf Coast; Houston Cable; Meca; Houston Community; Westland; and G. B. Communications. At the November 29 meeting, the ordinances were tabled until December 13, 1978, and plaintiff was granted a hearing on its application on December 12, 1978.

---

8. Defendants make much of plaintiff's closing argument and the focus therein on boundary agreements. The Court acknowledges that the content of the closing argument tends to demonstrate further that plaintiff concentrated heavily on proving the boundary agreements and relied to a large extent on the existence of the agreements to prove an antitrust violation. Relying on the closing arguments, or utilizing their content for any aspect of the resolution of these motions, however, is impermissible inasmuch as nothing contained therein constitutes evidence.

After plaintiff's presentation on December 12, plaintiff's application was referred to the Public Service Department for evaluation, and all of the ordinances were tabled again so that the franchises could be referred to the public service and legal departments for their recommendations. On December 20, 1978, written recommendations from those departments for the following applicants were made to City Council: Houston Community; Meca; Houston Cable; Westland; Gulf Coast; and Affiliated Capital. On the same date, the following ordinances were passed upon first reading: Gulf Coast; Houston Cable; Westland; and Houston Community. The franchise ordinance applications of Meca and plaintiff were tabled for one (1) week. On January 10, 1979, the franchise ordinances of Gulf Coast, Houston Cable and Westland were passed on the third and final reading. Inasmuch as Gulf Coast's franchise contained within it all of the area plaintiff had applied for, the approval of Gulf Coast effectively preempted plaintiff's application.

## 2. Evidence of Conspiracy

Within that framework plaintiff asserts that many of defendants' acts demonstrate the existence of agreements that "were designed to ensure that only those companies participating in the understandings would receive cable television franchises, to ensure that participating companies would not be in the position of having to compete with each other with regard to the terms of the contractual commitments each would offer the City in order to obtain a franchise, and to ensure that competitors who did not participate would be prevented from obtaining franchises." With regard to that assertion, the Court's task is to ascertain what evidence in the record tends to prove plaintiff's contentions apart from the evidence which relates solely to the boundary agreements found by the jury not to be part of the conspiracy.

The Court acknowledges that even though the jury responded negatively with regard to the boundary agreements, evidence pertaining to those agreements could demonstrate the parties' intent to conspire, when considered cumulatively with independent evidence of the conspiracy. *See, e. g., United Mine Workers of America v. Pennington,* 381 U.S. 657, 670 n.3, 85 S.Ct. 1585, 1593 n.3, 14 L.Ed.2d 626 (1965); *United States v. Southern Motor Carriers Rate Conference,* 439 F.Supp. 29, 47 (N.D.Ga. 1977). In light of the jury's finding, however, evidence pertaining to those agreements, or inferences to be derived therefrom, cannot be considered as evidence sufficient to prove the existence of the conspiracy; evidence of other conduct, wholly unrelated to the boundary agreements, and independently demonstrating, directly or circumstantially, that a conspiracy existed, must be present in the record to sustain the jury's affirmative answer to Interrogatory No. 3.

For purposes of identifying such evidence, the Court recounts below all of the proof plaintiff has designated which the Court agrees independently will support the existence of the second theory of a conspiracy. Where other portions of the evidence cited by plaintiff in its brief as supporting the second conspiracy are omitted, it is because this Court views such evidence as related solely to boundary agreements. By omitting those portions, the Court rules that, when stripped of their boundary content, the acts identified by plaintiff are no evidence of, and can evoke no inferences of, the existence of a conspiracy to limit competition.[9]

---

**9.** For example, plaintiff cites a reference by Clive Runnells to discussions between Gulf Coast and other applicants in a letter he wrote to his partners on August 29, 1978. Plaintiff's Exhibit 10. Plaintiff asserts that an inference can be drawn therefrom that successful applicants had agreed to cooperate rather than compete. An examination of the entire paragraph from which the reference to discussions is ex- tracted reveals that Runnells was referring to the areas the applicants had applied for and was correlating that information to Gulf Coast's chances of being successful in obtaining the area for which it had applied. He specifically made reference to boundary negotiations with other applicants:

Regarding the Houston franchise application, I trust you have been kept informed by

By late August 1978, Clive Runnells, on behalf of Gulf Coast, had agreed with Meca that they would be friendly competitors.[10] Testimony of Clive Runnells. Al Levin, Affiliated Capital's lawyer during the franchising process, testified that by September 20, 1978, he contacted Bill Chamberlain, an agent of Gulf Coast. Chamberlain told him that Gulf Coast's attorney Bill Olson "was a pushing force of the cable TV situation at that point." Levin further testified that he then contacted Olson and Olson told him, "as far as I am concerned, Al, it's too late; the pie has already been cut." [11] Olson added: "Al, tell Billy [Goldberg] he is too late on this one." "[Olson's] words were, 'the City is locked up by five franchises.' " On the day before this telephone conversation between Levin and Olson, Olson had told Jonathan Day, an attorney for Houston Cable, that Olson was "trying to put map together" and that "most of areas are defined on eastern side." Plaintiff's Exhibit 63.

On September 28, 1978 a lawyer for Houston Cable wrote to the lawyer for Gulf Coast regarding the franchise ordinance:

> Enclosed is a copy of the proposed cable television ordinance marked to show deletions and additions, including some recommended by our FCC counsel. Also enclosed is an unmarked copy for your convenience.

> the newspaper articles and other information received over television and radio. To clarify the situation, enclosed is a map which appeared in the Houston Chronicle which more or less defines the areas each applicant has applied for. There is another applicant appearing this coming Wednesday afternoon, and at this time we do not know what area they will ask for. As you may or may not know, the deadline for applications has been set by the City for September 1. In light of the fact our application was the first to appear before City Council, and we have had discussions with other applicants, we feel fairly certain if franchises are granted we should receive the franchise for the southwest part of Houston. We have agreed to give up to the Walter Mischer et al. group the area from Katy Freeway to 290, excluding Spring Valley Village. We do not know exactly where we will stand with the Storer

The enclosed form of the proposed ordinance has been placed in our word processing equipment. Consequently, any changes or additions you wish to make can be easily accommodated. As we discussed, the enclosed form should be considered as an internal working draft so that we can reach an agreed proposal to present to the city.

Plaintiff's Exhibit 14. A week later he wrote another letter recounting that they had met on this franchise ordinance, and noting their discussions of various provisions of this proposed ordinance, including the provision with respect to the percentage of the City's interest in the gross revenues from the ordinances:

> Enclosed is a revised form of CATV ordinance with the changes we discussed at our last meeting in Section 8.G; Section 10.B; Section 11.D; Section 12.H, J, and M; and Section 23.A.

> Also enclosed is a suggested revision to Section 20.A regarding the three percent of gross revenue issue in the event we are unsuccessful in limiting the franchise fee to regular subscriber service.

> If you have further comments or suggestions regarding this proposed form of ordinance, please let me know.

Plaintiff's Exhibit 15. None of the referenced sections of the proposed ordinance relates to boundaries.

> group, for we know they would like part of our south area, but at this time we have not reached any accommodation with them.
> Plaintiff's Exhibit 10.

10. Prior to that time Gulf Coast and Houston Cable had met concerning boundaries, Testimony of Clive Runnells; the jury could have found those discussions and ensuing agreement to be evidence of the applicants' intent to limit competition.

11. Defendants assert that this testimony can refer only to boundary agreements. The Court concludes that, in light of the testimony regarding the City's being "locked up", allusions to "cutting the pie" reasonably are not confined to territories. An inference can be derived from that testimony that the defendants had decided who would get franchises regardless of what geographic areas the franchises would cover.

In October 1978, Runnells and others met with Mayor McConn. At that meeting, Runnells was informed that McConn wanted Westland to have a franchise. Westland had applied for a portion of the area sought by Gulf Coast, and the Mayor indicated to Gulf Coast that a general area, Westbury-Meyerland, was what he wanted Westland to have.[12] Testimony of Clive Runnells; Testimony of James McConn.

On November 22, 1978, notice of the November 29th City Council agenda indicated that six (6) ordinances, five of which ultimately were approved, would be considered. On November 27, 1978, the attorney for Houston Cable, one of the applicants scheduled on the upcoming agenda, sent a final proposed cable television ordinance to the City Attorney:

> Enclosed is a revised form of the proposed cable t.v. ordinance which includes the modifications made this week-end.

> In order to meet the proposed time schedule, any further revisions must be agreed by 12 noon on Tuesday, November 28. Final proofing of the enclosure will be completed by that time.

Plaintiff's Exhibit 29. He also sent a copy of the ordinance to Gulf Coast's attorney, who had discussed it with the lead counsel for Houston Cable earlier that morning:

> Enclosed is the proposed cable t.v. ordinance which Jonathan Day discussed with you this morning. Also enclosed is a copy of the transmittal letter to the City attorney.

> I have marked significant changes in red in order to facilitate your review. If you have any questions or comments, please let me know.

Plaintiff's Exhibit 30. The next day Houston Cable's attorney sent copies of the ordinances to the ultimately successful applicants. The proposed ordinances were complete except for the names of the applicants and their proposed service area. Plaintiff's Exhibits 32 & 189. The successful applicants then filled in the blanks with their names and service areas, and forwarded the ordinances to the City Attorney. Some applicants sent their proposed ordinances back

**12.** In developing the evidence concerning the Westland matter, plaintiff further asserts the following with regard to the testimony about the November 20, 1978 meeting between Gulf Coast and Westland which was scheduled at the Mayor's direction:

> Clive Runnells testified that there were two separate and distinct aspects of the meeting between Gulf Coast and Westland. First, Gulf Coast received Westland's agreement to take a different boundary than it had applied for. Second, Runnells testified that it was "a good possibility" that the Westland meeting "was an insurance policy that if City Council followed the Mayor's wishes that [Gulf Coast] wouldn't get [their] application denied in its entirety." Testimony of Clive Runnells, Jan. 29, 1981, at 47–48, App. Exh. 10. This again, provides an inference of the nature of the understanding: those applicants party to the understanding who were willing to cooperate rather than compete would get franchises, and others, including plaintiff, would not.

An examination of Runnells' testimony on that matter reveals that Runnells felt that because Gulf Coast had made an accommodation with Westland on boundaries, Gulf Coast's application likely would not be rejected in its entirety by City Council if City Council followed the Mayor's wishes with regard to Westland's application. The conditioning of the "insurance policy" on the boundary agreements is inescapable, however, and the Court perceives no possible inference from that testimony that the boundaries and the "insurance policy" were two separate and distinct aspects of the meeting. Furthermore, no possible inference can be drawn that the willingness to cooperate rather than to compete had any frame of reference other than cooperation with regard to boundary agreements. The testimony of Runnells on January 29, 1981 with the regard to that matter was as follows:

> Q Well, sir, the fact of the matter is you did receive two things from the Westland meeting, did you not, and the first thing you received was their agreement to take a different boundary than they had applied for, that's number one, they didn't snuggle up under your soft belly?
> A It could be construed as that, yes, sir.
> Q The second thing you received, was it not, Mr. Runnells, was an insurance policy that if city council followed the mayor's wishes that you wouldn't get your application denied in its entirety, that was the second thing you received, wasn't it, sir?
> A I—
> Q That was a possibility?
> A That was a good possibility, yes, sir, but I don't say it was an insurance policy. I feel we received nothing from it.

Testimony of Clive Runnells.

to the Houston Cable Attorney who then forwarded them to the City. Plaintiff's Exhibit 35.

The agenda for the City Council meeting of November 29, 1978 contained six (6) cable television franchises, not including plaintiff's, Plaintiff's Exhibit 33; those ordinances had been placed on the agenda on or before November 22, 1978, Plaintiff's Exhibit 174.[13] When Affiliated attorney Levin heard of this, he contacted Assistant City Attorney Adrian Baer. Baer relayed the following information to Levin:

> [T]he Mayor and City Council had made their decision, and [Baer] said, 'I learned this directly from the Mayor, the franchises are non-exclusive, he does not know about the areas, it's still being worked out by Williams and Baer ... so the net result will be a de facto exclusive."

He [, Baer,] explained to me that there were—the decisions as to who was going to get what areas, specifically in terms of the actual boundaries, were still under negotiations, but the decision as to who was fait accompli.

Testimony of Al Levin; Plaintiff's Exhibit 106.

After an on-site inspection of Gulf Coast's Bellaire facilities, Sadowski, the consultant hired by the City of Houston, told Earle, Director of Public Service, and Baer, Assistant City Attorney, that he would reject Gulf Coast's application. The next morning, Sadowski was fired. One day later a messenger from Earle retrieved the notes Sadowski had made concerning the applications. In his notes, Sadowski had not recommended that Gulf Coast's application be rejected, in spite of his oral

---

**13.** In analyzing the evidence, the Court is obligated to give plaintiff the benefit of all reasonable inferences which can be derived from the evidence which was presented to the jury. Plaintiff's assertions with regard to the agenda are as follows:

> The evidence also shows that the ordinances were placed on the agenda for the November 29 Council meeting on or before November 22. Plaintiff's Exh. 174, Supp. App. Exh. 2. Clearly the five ordinances were placed on the agenda before the City knew the agreed-to boundaries for the five franchises, since the Council was not provided with the completed ordinances and a map of the boundaries until November 29. Plaintiff's Exh. 35, App. Exh. 13.. This evidence permits an inference that the successful applicants were assured of their success before the City knew what boundaries had been agreed to, or even whether boundaries had been agreed to. Additionally, the fact that the attorneys for the applicants worked over the weekend of November 25 and 26, and knew of the deadline imposed by the Council meeting on November 29, Plaintiff's Exh. 29, App.Exh. 11, indicates that they knew then that they would be the successful applicants.

Defendants City of Houston and McConn make certain assertions concerning the import of that evidence which tend to demonstrate the tenuous nature of that proof as support for plaintiff's position:

> Plaintiff also argues that the mere appearance of the five (5) successful applicants on the agenda is further evidence of a conspiracy to exclude plaintiff. What the plaintiff does not point out is the fact that it would have been virtually impossible for plaintiff to even have been considered, much less ex-

cluded, in light of the fact that the first serious step which plaintiff took toward acquiring a franchise was the completion of its questionnaire and its filing only two days prior to the posting of the agenda. [November 16, 1978. Further, plaintiff did not file its supplemental application until November 28, 1978.] Since the agenda, by law, must be posted a certain number of days prior to Council action, it is completely illogical to infer that some conspiracy exists simply because counsel for the applicants which appeared on the agenda, and the City Attorney, continued their negotiations as to franchise language and boundaries after the agenda was posted. If Council was going to vote on the ordinances on November 29, it was incumbent that the ordinances be in final form by that date. Plaintiff's Exhibits 29 and 30 demonstrate conclusively that negotiations were still proceeding on the terms of the franchise as late as the weekend of November 25 and 26, and, indeed, "significant changes" were made in the terms of the ordinance during that negotiating session. (See Plaintiff's Ex. 30).

The Court further points out that the ordinances were scheduled for a first reading on November 29, 1978, and three readings were required before approval was final. Plaintiff's Exhibit 150 at 39–40. Nevertheless, the Court must consider the agenda evidence because it possibly might support an inference favorable to plaintiff, particularly when it is considered in combination with evidence concerning Baer's conversation with Levin about the agenda, which is described at 1001–1003, *infra*.

suggestion to that effect to Earle and Baer, and he testified that he would have made no substantive changes in his report after the visit to Gulf Coast's facilities. He had recommended in his report, however, that Gulf Coast be given a smaller franchise area than that for which it had applied. When Sadowski's notes were typed by someone in the City, that recommendation was deleted. Moreover, other significant changes were reflected in the typed version of the notes Sadowski had turned over to Earle's messenger: his recommendations that Houston Community Cable, Houston Cable, and Columbia (Westland) be rejected were changed to recommendations that they should continue to be considered; and his statement that Cablecom had presented the only satisfactory application was omitted. Testimony of Robert Sadowski.

Prior to the plaintiff's hearing before City Council on December 12, 1978, McConn suggested to Goldberg that Affiliated seek a franchise in another area of the City rather than in the area sought by Gulf Coast. McConn testified as to his motivation for the suggestion: "I thought that, in trying to really help Mr. Goldberg, it was pretty obvious to me that Gulf Coast had the muscle and that Mr. Goldberg did not."

At the City Council hearing on plaintiff's application which was conducted on December 12, 1978, the following comments were made by Councilman Goyen:

Mr. Goldberg, let me address Council's wisdom. As these applications came in, they were sent to the Legal Department. Obviously, a number of lawyers got together and did whatever they did. I was not privy to it nor did I want to sit in on any meeting.

Apparently, they came up with the formula that those applicants agreed upon. I was hoping that your situation might end up in the same pot as the others, whereby there would be some kind of recommendation coming before this Council, and this Council would not have to carve from one to give to another, which we have not had to do in the past and which I do not want to do now nor do I intend to.

I do not want to taketh away and giveth to somebody else, because I haven't had to do that in the past. You have a very competent attorney, and the other people have very competent attorneys. What I would like to see done, and it might take a motion to get this done, is to send this to the Legal Department and try to work something out.

Plaintiff's Exhibit 150 at 27–28. Subsequently, the Council discussed how to proceed with plaintiff's application, and Councilman Mann made the following suggestions:

I want to make a substitute motion that the [plaintiff's] application be referred to the Legal Department, and they in turn can contact these other applicants who have come forward and see if they can work out something.

. . . .

If you take this, fine, then see how much Gulf Coast is going to knock off this other group on farther down and then around and around.

. . . .

Substitute motion that this application be referred to the Legal Department and Public Service, and they are to contact the other people that have ordinances and guarantee that these boundaries are being adjusted between them, and they report back to Council.

Plaintiff's Exhibit 150 at 37, 39, 40.

Also at that hearing, Mann indicated his knowledge of a house-count survey that had been conducted by Gulf Coast. Plaintiff's Exhibit 150 at 25. The survey resulted in a comparison between the area plaintiff was applying for and an area that was within Houston Cable's application, Plaintiff's Exhibit 84, and was conducted in conjunction with a proposal by Gulf Coast that if Houston Cable would give the identified area to Gulf Coast, then Gulf Coast would be willing to give plaintiff its area. Testimony of Al Levin. A document, prepared sometime between November 28, 1978, and December 20, 1978, by Assistant City Attorney Baer bears an alternative boundary description

for the Gulf Coast franchise including the Houston Cable area, with Baer's notation: "I–10 line shifted to Hwy. 290 without Goldberg's tract—contingency." Plaintiff's Exhibit 56.

City Council favored Gulf Coast's franchise, which subsumed the area plaintiff had applied for, and at trial several councilmen and Mayor McConn testified as to their reasons therefor. McConn's concern was to keep politically influential groups content:

Q You didn't want to step on anybody's political toes, did you?

A Not if I could avoid it.

Q You didn't want to make any type of political decision where some powerful person like Walter Mischer would be unhappy, did you?

A Not if I could avoid it.

Q And if all of the parties could work things out, then you wouldn't have to make any type of decision, other than approving their agreements, isn't that correct?

A Yes, generally that is correct, yes, sir.

Q And isn't that what you wanted to happen?

A That would have been beautiful, if it could have happened that way.

Q But when it didn't happen and you had to make the choice between Southwest Houston and Gulf Coast, you stated that the other—you thought the other people were more politically powerful than Southwest, isn't that correct?

A Yes, sir. I don't know if I said that, but I'll say it now.

Testimony of James McConn.

Councilman Goyen testified by deposition that he would have voted for Affiliated Capital's application if "on the 20th, Mr. Goldberg had come in and Mr. Runnells had come in, Mr. Mischer had come in, and all the principals had come in, and a piece of Houston had been carved out for Mr. Goldberg with no objection by anybody." Councilman Robinson testified that he would have supported Affiliated Capital's application if plaintiff had been able to work something out with Gulf Coast to give him what he wanted. Councilman Westmoreland testified that he did not disagree with his prior deposition testimony that Affiliated had been unable to work out any type of arrangement with Gulf Coast, and for that reason Westmoreland voted in favor of Gulf Coast.[14]

**14.** Defendants assert that the evidence of what Councilman Goyen said at the December 12 hearing, of the contingency proposal by Gulf Coast and of the councilmen's reasons for favoring Gulf Coast cannot be considered because all of that evidence concerns boundary agreements, which agreements the jury determined were not unlawful. Interrogatory No. 1 which the jury answered negatively asked whether the boundary agreements were part of the conspiracy, not whether the boundary agreements themselves were illegal.

The plaintiff's inconsistent interpretations of the jury's answer to that question, however, demonstrate how illusory is its assessment of what was intended by the jury to be the scope of its negative answer. In one place in Plaintiff's Brief Demonstrating Inferences from the Evidence, plaintiff asserts that "The jury was *not* asked whether the boundary agreements were themselves unreasonable restraints of trade; they were asked whether they were proven to be part of a conspiracy in restraint of trade...." In another place in the same brief, plaintiff asserts that "Since the words 'part of' were never defined, the jury might simply have ignored them or (which would amount to the same thing) construed them to mean that the boundary agreements had to share all the characteristics of a conspiracy in unreasonable restraint of trade as defined in the instructions, including anti-competitive purpose, unreasonableness, and causation." The latter interpretation of the jury's answer is equivalent to saying that the jury found that the boundary agreements were not unlawful.

The Court believes that the more reasonable interpretation of the jury's answer to Interrogatory No. 1 is that the jurors thereby intended to convey that they perceived nothing wrong in the applicants' having made boundary agreements. Resolution of the issue, however, is unnecessary to the Court's determination of whether the evidence under examination falls within the scope of Interrogatory No. 3. Interrogatory No. 1 specifically addressed boundary agreements which had been accomplished; the jury's negative answer thereto, accordingly, cannot preclude consideration as independent evidence of a conspiracy either the City officials' encouragement to applicants to adjust further the agreements already made, or Gulf Coast's attempts to adjust further the agreement between itself and Houston Cable.

Finally, plaintiff's expert witness, Martin Malarkey, testified at length about the detrimental results of the noncompetitive franchising process in Houston, and about the benefits to residents of other cities where the process has involved competition on the merits of the applications. According to his testimony, the benefits include lower rates, provisions for sanctions in the event of noncompliance by the franchisee, provisions for performance bonds, and provisions requiring city approval prior to changes in ownership or control of the franchises. Further, he testified that normally the city itself prepares the franchise ordinance, rather than allowing applicants to do so.

Having reviewed the entire record and excised the portions of the evidence which relate solely to boundary agreements, the Court is persuaded that sufficient evidence was presented for the jury to infer that each of the defendants had participated in a conspiracy to limit competition from nonconspirators and to limit competition among co-conspirators. Defendant McConn has asserted that none of the evidence apart from that related to boundary agreements tends to demonstrate his involvement in any conspiracy as described by plaintiff. The Court concludes that a review of the above-recited evidence belies McConn's contention. Defendant Gulf Coast asserts that inasmuch as its general partner, Clive Runnells, was the sole decision-maker on behalf of Gulf Coast and was exonerated by the jury, Gulf Coast cannot be liable even if a conspiracy is supported by the evidence. Preliminarily, the Court observes that Chamberlain and Olson were agents of Gulf Coast and acted on behalf of Gulf Coast in many of the contacts with the City. Secondarily, even though the jury found that plaintiff failed by a preponderance of the evidence to prove that Runnells participated in the conspiracy, the jury could have considered evidence of the acts of Runnells, in combination with those of other agents of defendant, in deciding that the corporate defendant participated in the conspiracy.

### B. The Issue of Causation

Plaintiff asserts that evidence of causation necessarily is inferential and that, having considered all of the evidence which supports the existence of the second theory of conspiracy, "the jury could have concluded that when Affiliated was directed to negotiate with its competitors for a place in the franchise package, it was not the boundary agreements that injured plaintiff, but the unwillingness of the private participants in the conspiracy to divide up the pie any further." With regard to that assertion, defendant Gulf Coast counters that, "In other words, causation lay in the unwillingness of the private parties further to amend their boundary agreements on a voluntary basis. In the absence of them, the issue would not have arisen. This hardly can be said to represent evidence *apart from the boundary agreements* of a conspiracy which caused harm to plaintiffs." The Court is constrained to agree with defendant.

The five franchises which ultimately were awarded and which were represented among the ordinances considered by City Council on December 20, 1978, covered the entire city.[15] Accordingly, even though one could infer from the evidence that the successful applicants' refusal to accommodate plaintiff resulted in plaintiff's not having its franchise application approved, the sole reason that plaintiff failed to receive a franchise was that Gulf Coast refused to readjust boundary agreements previously made. Had the boundary agreements not been made, the city well might not have been covered by the successful applicants' franchises. The boundaries, however, were established before the ordinances were considered by Council. The applicants thereby

---

**15.** Between December 20, 1978 and January 10, 1979, a further adjustment was made between applicants with regard to the boundaries of the Meca and Houston Community Cable franchises. Plaintiff's Exhibits 41 & 97. That readjust-

ment, however, does not alter the facts that on December 20, 1978 and January 10, 1979, the five prevailing franchise applications covered the entire geographical area of the city.

had eliminated the primary, and perhaps only, concern of the Council,[16] and the applicants declined to accommodate plaintiff by renegotiating or readjusting those boundaries previously agreed upon. The jury clearly found that those boundary agreements were not part of a conspiracy in unreasonable restraint of trade in their answer to Interrogatory No. 1. Thus, the agreements to allocate and divide territory cannot be considered as evidence proving causation of plaintiff's injury, and no other evidence in the record, either direct or inferential, provides the necessary connection between the second theory of conspiracy to exclude non-conspirators and the plaintiff's failure to receive a franchise.

The testimony elicited by plaintiff from its expert witness further demonstrates that what plaintiff established was a causal relationship between the applicants' agreements to eliminate overlaps in territory and the plaintiff's failure to be awarded a franchise, rather than a relationship between the agreement to exclude non-conspirators and plaintiff's injury. The sum of plaintiff's direct evidence of causation is revealed in the following excerpts from the testimony of Martin Malarkey. Preliminarily, plaintiff asked its expert to opine whether overlapping franchises should have been awarded.

Q Does it make any sense to you, Mr. Malarkey, from your experience, if you are granting franchises, to grant overlapping areas? Does it make economic sense to do that, sir?

A Two franchises for the same area?

Q Yes, sir.

A No, sir, it does not.

Q Sir, if a franchise that a city does award does not overlap, then where is there any competition in the cable industry?

. . . .

A Competition takes place when the city advertises for bids, for applicants to come in and offer to provide ser-vice to an entire community or given parts of the community.

Q So the competition takes place in the franchising process—

A Absolutely.

Q —itself?

A Yes, sir.

Testimony of Martin Malarkey, February 4, 1981.

Plaintiff then asked about the correlation between overlapping franchise areas and competition on the merits of the applications:

Q Sir, if applications were filed by several companies for the same areas, and if overlaps between these applicants were not resolved by agreement or any way else, based upon your experience in other cities would there have been competition on the merits of these applicants?

A Absolutely.

Q By the way, sir, other than what you have heard about Houston, in '78, are you aware of any market where the applicants, either before or after they were selected by City, got together, themselves, and eliminated boundary overlaps between them?

A No, sir. I have never—I have not heard of that.

Testimony of Martin Malarkey, February 4, 1981.

As indicated by the excerpts of testimony recounted below, all of plaintiff's causation questions which were related to plaintiff's failure to receive a franchise sought to establish a connection between that failure and the boundary agreements. Plaintiff did ask its expert witness many questions related to the causal connection between the non-competitive nature of the Houston franchising process and the detrimental effects on consumers in Houston; however, any injury inflicted on the public cannot be substituted for the direct injury of which plaintiff complained and for which plaintiff sought damages. The following questions were posed by plaintiff to its expert:

**16.** Clive Runnells testified that sometime before July 17, 1978 he had "received word from City Hall that if boundaries could be agreed to, City Hall would be happy about it."

Q Based on those three assumptions,[17] sir, that I gave you, do you have an opinion as to whether the elimination of all other boundary disputes prior to December 20 contributed to Affiliated's failure to obtain a franchise?

A Yes, it certainly did.

Q Could you explain that opinion, sir, to the ladies and gentlemen of the jury?

A Yes, sir, I will try to.

If we assume that Westland and Houston Cable were not as well qualified as Gulf Coast and Affiliated Capital—first of all, the die was cast at this point in time, and when you have large companies that have already agreed on the boundaries Affiliated Capital wouldn't have had a chance, regardless of how qualified it was.

But given the fact that there were overlaps and that Affiliated Capital and Houston—I beg your pardon and Gulf Coast were equally qualified, then council could have given this portion that was under contention back to Gulf Coast and given what Affiliated Capital requested to Affiliated Capital. Gulf Coast would have ended up with an even larger section than they have today.

And if you wanted to assume that Westland was equally as well qualified, and that had been granted to Westland and this portion had been granted to Gulf Coast and Affiliated Capital would have been given the area that they had applied for, Gulf Coast today would have had still a larger area than it has.

Testimony of Martin Malarkey, February 5, 1981.

The expert witness also discussed the reasons he believed that an applicant would have incentive not to engage in competition with another applicant for the same area:

Q Based upon your experience in cable television was it in the economic interest of each applicant in this market to avoid competing with the other applicants for the same territory?

A It certainly was.

Q Sir, have you prepared a list of the reasons you believe an applicant has an incentive not to engage in competition with another for the same area?

. . . .

Q Mr. Malarkey, this chart, which reads, "Incentive for Applicants to Agree on Areas That They Will Seek," will you describe for us, sir, what the first incentive is?

A Well, the first one, in effect, says let's avoid having any losers altogether, in effect. Let's just have winners in this process; avoid one of the applicants being denied a franchise or getting less than the desired area.

Q Could you explain to us, sir, what the second incentive to avoid competition would be?

A Well, that is fairly self-explanatory. I said here avoid the need to compete on the merits, as to the ability and services and the rates offered. In a highly competitive procedure there would have been very substantial competition with regard to the—not only the financial aspect, but the services, the programming to be offered and the charges that they were going to ask for those services. That was completely out, here in Houston.

Q And the third factor, sir?

A Well, as I understand it, a referendum in the State of Texas only re-

---

17. The assumptions were as follows:

Q The first assumption I would like you to accept, Mr. Malarkey, is that the decision between Gulf Coast and Affiliated Capital was made on the merits on December 20. Can you accept that?
A Yes, sir.
Q Will you accept another assumption, sir, that Gulf Coast and Affiliated Capital were equally qualified, as the Public Service and Legal Department said?
A Yes, sir.
Q I would like you also to assume, sir, that Gulf Coast was more qualified than Houston Cable or Westland, all right?
A Yes, sir.
Testimony of Martin Malarkey, February 5, 1981.

quires a rather limited number of signatures, and the applicants here in Houston have been pretty well divided up, and the last thing in the world they wanted to face is a referendum, which would upset these procedures and perhaps force the City to go into a competitive franchising process.

Testimony of Martin Malarkey, February 4, 1981.

A review of that testimony indicates that the expert believed that one reason applicants might wish to agree on territories is that they thereby would ensure their own success and a second reason is that they would not have to compete on other franchise terms. Thus, plaintiff elicited testimony from its expert which demonstrates that the boundary agreements were the foundation of and incentive for not only the objective of the conspiracy but also the other agreements among applicants which prove the existence of the conspiracy.

The Court perceives that evidence as being in direct contradiction to plaintiff's assertion that, "The jury could have concluded that the boundary agreements were not 'part of' the conspiracy because all competition between the applicants had already been eliminated by agreement not to compete on franchise terms. Once the successful applicants agreed not to compete against each other on the merits and to limit competition from outsiders, boundary agreements were simply incidental to and not 'part of' the conspiracy." Although plaintiff appropriately can argue that the jury is free to consider any reasonable inference from the evidence, including that above, what plaintiff's expert described to the jury was a reverse situation from what plaintiff now argues was inferred by the jury: [18] the applicants agreed on boundaries for the reason that they thereafter, and consequently, would ensure their success and would not have to compete on other terms. The jury's finding that the boundary agreements, which plaintiff's evidence demonstrated were the essential factor in plaintiff's failure to get its franchise approved, leaves plaintiff in the dilemma of having proved that a second theory of conspiracy existed to exclude non-conspirators and to limit competition among co-conspirators, but of having presented no proof other than that of boundary agreements which connects that conspiracy to plaintiff's failure to obtain its franchise.

18. In one part of its brief, plaintiff characterizes the expert's testimony in the same way that the Court has done, that is, that the boundary agreements were the focal point and the initiating cause of the conspiracy:

> For example, consider the fact that plaintiff's expert testified that the purpose of the boundary agreements was to remove any incentive for the conspirators to compete as to franchise terms. *See* Testimony of Martin Malarkey, Feb. 4, 1981. The jury may have believed, however, the conspirators agreed not to compete on franchise terms, and generally to be "friendly competitors," without regard to whether they overlapped with one another. The four results of the noncompetitive franchising process to which Mr. Malarkey testified, *id.* at 57–61, would have occurred without regard to boundary overlaps if the conspirators simply agreed not to compete as to franchise terms.

Said assertion was made in the context of plaintiff's identifying the evidence which would support the existence of the conspiracy addressed in Interrogatory No. 3. Plaintiff's characterization of what the jury "may have believed" is appropriate with regard to the existence of the conspiracy in light of the other evidence which the Court believes was presented on that issue.

In the context of isolating evidence of causation, however, the testimony of plaintiff's expert constitutes the sum of what plaintiff presented, and all the jury had before it was the evidence that the pre-packaged deal which resulted from previous boundary agreements was the factor that caused plaintiff's failure to have its franchise application approved. The Court perceives no difference in result, even when plaintiff's failure to be approved is described as having arisen out of the combination of the City's instructions to plaintiff to seek approval of the other applicants who already had agreed on boundaries and those applicants' subsequent refusal to readjust prior agreements or to surrender territory identified pursuant to those agreements, in order to make room for plaintiff. Plaintiff wanted and applied for only an area that would have infringed upon the territory Gulf Coast had identified and applied for after Gulf Coast agreed on boundaries with other applicants. Plaintiff failed to receive its franchise because Gulf Coast and the other applicants refused further to adjust their boundaries to accommodate plaintiff.

Plaintiff's expert then proceeded to explain what he ascertained were the results of Houston's non-competitive franchising process, which he previously had characterized as non-competitive on the ground that territorial overlaps had been eliminated. None of those results tended to show a connection between the conspiracy the jury found and plaintiff's injury. The only result articulated by Malarkey which might relate to plaintiff's injury is the first: "Applicants were not considered on the merits." Malarkey explained that result as meaning that "there was absolutely no consideration given to the merits of each of the applicants with regard to programming, prices to be charged, technical aspects. Of course, the financial aspect." Testimony of Martin Malarkey, February 4, 1981. That result, however, cannot be relied upon to establish the necessary connection, because Malarkey also testified that all applications, including plaintiff's, were well below standard and not at all informative as to many important aspects of a franchise application. The only factor on which Malarkey concluded that plaintiff was better qualified than any of the five ultimately successful applicants was plaintiff's financial capability to build the cable system that it had applied for. Thus, the only conclusion that reasonably can be inferred from the expert's testimony is that none of the applications was considered on the merits because the five successful applicants had eliminated that necessity by entering into boundary agreements and thereby presenting a ready-made package to City Council.

The evidence recited herein constitutes all of the evidence which plaintiff presented on causation. The Court concludes that none of the evidence tends to demonstrate any cause for plaintiff's failure to be awarded a franchise other than the fact that the successful applicants made agreements with regard to what territories they would seek. Accordingly, the jury's affirmative answer to Interrogatory No. 5 on causation is totally unsupported by probative evidence in the record of this trial, and cannot be upheld.

## IV. The Propriety of Injunctive Relief

Plaintiff has requested two forms of injunctive relief: (1) prohibition against further agreements in restraint of trade; and (2) voiding of the franchise granted to Gulf Coast. Plaintiff asserts that it has standing to obtain both types of injunctive relief, and that with regard to the voiding of Gulf Coast's franchise, plaintiff has standing both as a competing applicant and as a potential consumer of cable television services in the area awarded to Gulf Coast.[19] Having been denied its motion for entry of

19. Concerning plaintiff's status as a competing applicant, defendants in essence contend that plaintiff has sought damages for the loss of its franchise at the fair market value of the franchise and that plaintiff therefore is not entitled to a double recovery by having the Gulf Coast franchise voided and thereby being able to compete again for the franchise. Plaintiff counters that it "is a proper person to seek injunctive relief even if defendants are correct in their assertion that as a potential competitor plaintiff lacks standing because it has been compensated for the value of the franchise sought." Further, plaintiff asserts that it has such standing as a potential consumer on the basis of its first amended complaint; however, plaintiff has moved for leave to file a second amended complaint which alleges with specificity its standing to seek injunctive relief as a potential consumer.

The Court does not agree that the allegations of plaintiff's first amended complaint suffice to accord plaintiff standing as a potential consumer. Further, the Court has denied plaintiff leave to file its second amended complaint, refer to note 1, supra, not only because the issue is moot in light of the rulings herein, but also because the Court is unpersuaded that fairness would compel such a result or that the traditional rules of equity would allow it. As defendant Gulf Coast points out, this eleventh-hour request should be estopped by the maxim that he who comes to equity must come with clean hands. Even if plaintiff's post-trial effort to amend its complaint cannot be characterized as an act of bad faith, at least it is perceived by this Court as an untimely effort to change the posture of the lawsuit so that plaintiff can seek a double recovery. In asserting that a post-trial evidentiary hearing on plaintiff's entitlement to injunctive relief as a potential consumer would not prejudice the rights of any defendant, plaintiff apparently overlooks the fact that the trial on the merits was consolidated with the injunction hearing. The Court is unpersuaded that the facts of this case require that plaintiff be given a second opportunity either to plead or to prove a different theory of its case.

judgment, plaintiff is not entitled to any form of injunctive relief; however, the Court engages in the following analysis to demonstrate that, even had plaintiff prevailed, it would not have been awarded injunctive relief in any form for the reason that plaintiff lacks standing to seek such relief.

 Injunctive relief pursuant to the antitrust laws is "available even though the plaintiff has not yet suffered actual injury . . .; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (citations omitted). "[A] private plaintiff may obtain injunctive relief against such violations only on a showing of 'threatened loss or damage'; and this must be of a sort personal to the plaintiff." *United States v. Borden Company*, 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954) (citation omitted). A private plaintiff "must not only show the violation of the antitrust laws, but show also the impact of the violations upon him, *i. e.*, some injury (or threatened injury where injunctive relief only is sought) proximately resulting from the antitrust violation." *Credit Bureau Reports, Inc. v. Retail Credit Company*, 476 F.2d 989, 992 (5th Cir. 1973) (citations omitted).

 With regard to the first requested form of injunctive relief, plaintiff makes the following contention:

> The franchise ordinances are, by their terms, nonexclusive. Accordingly, even in the absence of an order voiding Gulf Coast's franchise, subsequent applicants—including plaintiff, whose application is still pending—are not precluded from receiving a franchise to serve part of the City of Houston. The jury determined that defendants Mayor McConn, the City of Houston, and Gulf Coast participated in a conspiracy to limit competition for cable television franchises. The City may be called upon to act on an application for a cable television fran-

chise between now and the time the franchises expire by their terms. Moreover, at the expiration of the franchise term, the City will certainly have to act on applications for franchises. Accordingly, it is appropriate that the defendants be enjoined from participating in the future in a conspiracy to limit competition for cable television franchises.

With regard to plaintiff's assertion involving nonexclusive franchises and its still-pending application, the Court observes that plaintiff's expert witness testified at trial that awarding two (2) franchises for the same area would not be economically feasible. Accordingly, plaintiff's threatened injury comprised of having its pending application disapproved even if Gulf Coast's franchise is not voided is extremely remote at best. If Gulf Coast's franchise is not voided, and plaintiff accepts an award of a franchise within Gulf Coast's territory, plaintiff would be making a decision contrary to its economic interest. Accordingly, the Court concludes that the likelihood that plaintiff would suffer injury from having its current application turned down cannot constitute the "significant threat of injury" required by the *Zenith* holding.

With regard to plaintiff's threatened injury at the expiration of the current franchise period, the Court is compelled to point out that Mr. Goldberg testified at trial that he had given up on getting a franchise and wanted only to be compensated for his loss. Further, at the hearing on the post-trial motions plaintiff's counsel assured the Court that plaintiff would not seek a cable television franchise in Houston, even if Gulf Coast's franchise were voided and the area for which plaintiff originally had applied became available. In light of that assertion, the Court has difficulty identifying any significant threat of injury to the plaintiff when the current franchises expire. Thus, the Court concludes the plaintiff has failed to identify any threatened injury "of a sort personal to the plaintiff", as required by the United States Supreme Court in *Borden*, and plaintiff's entitlement to seek an injunction prohibiting defendants from

participating in agreements in restraint of trade must fail. For the same reasons, plaintiff also is not entitled to seek injunctive relief in the form of voiding Gulf Coast's franchise.

Plaintiff admonishes the Court that it must consider the public interest as well as the private interest in its resolution of the injunction issue. The Court acknowledges that the citizens of Houston likely were injured in the form of receiving inferior cable television services as a consequence of the non-competitive franchise process which is reflected in the record of this cause. The Court's concern for the public interest, however, is limited by the perimeters of the case before it and cannot obviate in this instance the necessity for plaintiff to have standing to seek injunctive relief. Plaintiff asks, "If this plaintiff does not have standing, what plaintiff would?" This inquiry is rhetorical at best in light of the allegations of plaintiff's first amended complaint which represent plaintiff only as a competing applicant, and in light of plaintiff's untimely attempt to amend its complaint further to reflect the status of potential consumer. The latter status, as plaintiff apparently belatedly recognized, provides the answer to plaintiff's question.

As defendant Gulf Coast points out, the relevant antitrust statute "does not dispense with the requirement of standing for a private plaintiff nor does it create attorneys general with authority to vindicate public interests out of private plaintiffs who have no private interests to be served." In determining that the private injunction action under the antitrust laws supplements and does not supplant Government enforcement of the antitrust laws, the *Borden* Court observed that "it is the Attorney General and the United States district at-

torneys who are primarily charged by Congress with the duty of protecting the public interest under these laws. ... the private plaintiff may be expected to exercise [his injunctive remedy] only when his personal interest will be served." *United States v. Borden Company, supra,* 347 U.S. at 518, 74 S.Ct. at 706. Having brought suit as a competing applicant to serve its personal interest of recouping money damages for loss of its franchise, plaintiff may not now persuade the Court to grant an injunction either on the basis that the Court has an obligation to act as guardian of the public interest, or on the ground that plaintiff must be permitted belatedly to change its status as well as the complexion of the case so that plaintiff can be characterized as a member of the cable-consuming public. In the current posture of the case plaintiff clearly has no standing to seek injunctive relief.

Finally, the Court must agree with defendants that voiding Gulf Coast's franchise would afford plaintiff an opportunity to seek a double recovery, regardless of whether plaintiff would avail itself of such opportunity. Had the record supported the jury's verdict, plaintiff would have received actual damages which were calculated on the basis of the fair market value of the franchise plaintiff did not receive. For the Court then to void Gulf Coast's franchise and thereby enable plaintiff to compete again, and possibly be awarded the opportunity to earn that amount a second time, would provide to plaintiff a double recovery. As a competing applicant, plaintiff elected to pursue a full damage remedy for its injury; injunctive relief is available only when no adequate remedy at law can be obtained. Plaintiff may not have both a remedy at law and one in equity.[20]

---

**20.** Gulf Coast points out another deficiency in the broad scope of injunctive relief sought by plaintiff:

[E]ven if Affiliated were to be accorded standing as a single member of the purchasing public, it would then encounter another traditional rule that 'equity acts specifically' and affords the petitioner in equity the specific thing to which it is entitled. 30 C.J.S.

*Equity* § 101 (1965). If it were shown ... that as a result of antitrust violations Affiliated, the private purchaser, had been foreclosed from the possibility of receiving 'data transfer, burglar and fire alarm protection, and the like' ..., then its equitable relief would be formulated around those services. Equity would not act to require forfeiture of an entire franchise covering 40% of the City

## V. The Immunity/Exemption Doctrines

 Defendant Gulf Coast contends that even if the acts relied upon by plaintiff to prove the existence of a conspiracy to exclude non-conspirators would support the jury's finding that such a conspiracy existed, those acts fall within the scope of the *Noerr-Pennington* doctrine which would render Gulf Coast immune from antitrust liability. *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (hereinafter *Pennington*); *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (hereinafter *Noerr*). Inasmuch as the Court has concluded that the jury verdict in favor of plaintiff cannot be sustained because of the deficiency of evidence of causation, defendant Gulf Coast need not rely on the *Noerr-Pennington* doctrine to avoid liability. For the same reason, defendants City of Houston and McConn need not rely on the immunity/exemption doctrines which they have asserted preclude their liability, refer to discussion at 1023–1029, *infra*. Nevertheless, the Court will analyze those doctrines in order to demonstrate that they would have been inapplicable on the current record, even if plaintiff had prevailed on the causation issue.

### A. Noerr-Pennington Immunity

In *Noerr*, truckers sued their competitors, the railroads, for violations of the Sherman Act which were premised on the railroads' having conducted a "publicity campaign against truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers." *Noerr, supra*, 365 U.S. at 129, 81 S.Ct. at 525. In reversing the judgment holding that the railroads' campaign had violated the antitrust laws, the Supreme Court held that "at least insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Id.* at 139–40, 81 S.Ct. at 531. Prior to so ruling, the Court had observed that "It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." *Id.* at 139, 81 S.Ct. at 530. The Court further found that a contrary construction of the Sherman Act not only would deprive public officials of valuable sources of information on matters affecting their decision-making but also would deprive people of their right to petition with regard to issues significantly affecting their own interests. *Id.*

The *Pennington* Court reaffirmed and expanded the *Noerr* doctrine by finding that, regardless of their intent or purpose, joint efforts to influence public officials do not constitute illegal conduct, "either standing alone or as part of a broader scheme itself violation of the Sherman Act." *Pennington, supra*, 381 U.S. at 670, 85 S.Ct. at 1593. *Pennington* involved a counterclaim of a small mine operator which alleged, *inter alia*, that the labor union and large mine operators had approached the Secretary of Labor and the Tennessee Valley Authority with certain proposals intended to drive small mine operators out of business. The Court found that such acts were exempt from Sherman Act coverage pursuant to the doctrine of *Noerr*.[21]

---

of Houston when a remedy could be afforded in terms of specific services for a specific customer.

**21.** The United States Supreme Court has determined that the doctrine of *Noerr* and *Pennington* also applies to the adjudicatory functions of administrative agencies and to judicial proceedings, but that it must be adapted when applied in such a context. *See California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1971), wherein the Supreme Court analyzed and defined the contours of the sham exception to *Noerr-Pennington* in the context of adjudicatory proceedings. Inasmuch as the City Council in the instant cause was acting in a legislative capacity during the franchising process, *see, e. g.,*

In both *Noerr* and *Pennington*, the Supreme Court articulated circumstances wherein certain activities could be excepted from the protection accorded petitioning, and therefore justify applicability of the Sherman Act. The *Noerr* Court provided the following exception to the immunity doctrine: "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533. The *Pennington* Court noted certain errors which the lower courts had made regarding damages, and in the course of that discussion concluded that "The conduct of the [private parties] did not violate the Act, the action taken to set a minimum wage . . . was the act of a *public official who is not claimed to be a co-conspirator*, and the jury should have been instructed, . . . to exclude any damages . . . suffered as a result of the [public official's] . . . determinations." *Pennington*, 381 U.S. at 671, 85 S.Ct. at 1594 (footnote omitted) (emphasis added).

Pursuant to this Court's analysis of the law on *Noerr-Pennington*, the jury was instructed fully on the two exceptions to the doctrine. With regard to the co-conspirator exception derived from *Pennington*, they were charged, in substance, as follows: "Joint efforts truly intended to influence public officials to take official action do not violate the antitrust laws even though the efforts are intended to eliminate competition, unless one or more of the public officials involved was also a participant in an illegal arrangement or conspiracy." Instruction No. 18. In the same Instruction the *Noerr* sham exception was explained: "The petitioning activity must be genuine. Protection does not extend to purported petitioning that is in fact a mere sham to cover what actually is nothing more than an attempt to interfere directly with the business of a competitor. That is, protection does not extend to activities that are merely a pretext for inflicting on plaintiff an injury not caused by any governmental action."

Thus, over the objection of Gulf Coast, the jury was permitted to consider two ways in which Gulf Coast would be prohibited from availing itself of *Noerr-Pennington* immunity, and in answer to Interrogatory No. 3., the jury found that Gulf Coast was not entitled to that immunity. Inasmuch as the Court concludes, for the reasons recited below, that the validity of the public official co-conspirator exception is well supported in the case law, and the justification for invoking the exception clearly is sustained by the record herein, the Court sees no need to analyze the facts of this case as they relate to the second exception, that involving sham activities, which first was espoused in *Noerr*.[22]

*Metro Cable Company v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975), the decisions involving an adjudicatory setting have only ancillary application to this case. The Court, however, finds the decisions instructive even if they are not dispositive of the issues herein.

22. Most courts have reserved the sham exception label for circumstances in which the conduct of the private parties is questionable, that is, where the activities of the private parties are not genuinely engaged in to petition government for action in the parties' self-interest, but are engaged in solely to inflict some injury on another party. *See, e. g., Kurek v. Pleasure Driveway & Park District of Peoria, Illinois*, 557 F.2d 580 (7th Cir. 1977), *vacated and remanded*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *reinstated*, 583 F.2d 378 (7th Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979). Some courts, however, also have applied the sham exception label in situations where the conduct of a public official is challenged. Thus, those courts have determined that when a public official is alleged to be a co-conspirator, no separate exception to *Noerr-Pennington* is created; instead such a situation falls within the sham exception. *See, e. g., In re Airport Car Rental Antitrust Litigation*, 521 F.Supp. 568 (N.D.Cal.1981); *Federal Prescription Service, Inc. v. American Pharmaceutical Association*, 484 F.Supp. 1195, 1209 (D.D.C.1980).

Other courts have decided that the public official as co-conspirator represents an entirely separate exception to *Noerr-Pennington*, rather than being part of the sham exception rather than public conduct. Those courts have indicated that separate-exception-view either by

In order to relate to this case those decisions in which courts have recognized the co-conspirator exception, the Court will outline the evidence tending to demonstrate that McConn and certain public officials acting as agents for the City not only were involved actively in the conspiracy to exclude non-conspirators but also directed certain of the activities of co-conspirators. The Court concludes that these actions amply demonstrate that McConn did more than merely agree to support the efforts of private conspirators. *Cf. Metro Cable Company v. CATV of Rockford, Inc.*, 516 F.2d 220, 230 (7th Cir. 1975) (Court found that inasmuch as Congress did not intend the Sherman Act to apply to "combined efforts to induce legislative action, [it could not have intended] the Act to apply if a member of the legislative body agreed to support those efforts." *Id.* at 230).

Preliminarily, the Court points out some of the background of the franchising process that was revealed during trial. The Court acknowledges that such facts are not evidence of the conspiracy; however, they should be brought out not only to demonstrate the elected representatives' lack of concern for obtaining the best available cable television services for the citizens of Houston, but also to provide at least a partial explanation for the ease with which the conspiracy in restraint of trade was formulated and perpetrated.

Plaintiff's expert witness testified that the franchising process is important in assuring that consumers get the best possible cable television services at the lowest possible rates. He further said that the way for a city to ensure vigorous competition for areas designated for cable television services is to invite applications from everyone who would be interested, and that the customary way for the city's interest to be exhibited is through advertisements in various trade journals. The expert opined that in 1978, Houston was a very attractive market for cable operators who vigorously would have competed for a franchise. The City, however, did not advertise its interest in acquiring cable television services, nor did it use any other method to invite a variety of applications. Further, he testified that franchise applications customarily are evaluated by persons knowledgeable in the field, and that when consultants are retained, they generally are brought in at the beginning of the process. A consultant usually would be involved in various aspects of the process, including the following: (1) drafting a franchise ordinance for submission to the city; (2) preparing requests for proposal documents and instructions to bidders; (3) evaluating each application, individually as well as comparatively; and (4) drafting the enabling ordinance. Although the first application for a cable television franchise in Houston was filed in July of 1978, the City did not hire a consultant until October. Having missed the preliminary steps described above, the consultant began an evaluation of the applications, but his employment was terminated in November 1978, before he prepared a final report. The testimony as to why he was fired was conflicting; however, at least Councilman Westmoreland felt that the Council could accomplish the franchising process without the benefit of the consultant's assistance.[23] Malarkey also testified that normally a city incorporates into the franchise ordinance

---

determining, without mentioning sham, that *Noerr* and its progeny would not bar applicability of the Sherman Act, *see, e. g., Duke & Company, Inc. v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975) *and Harman v. Valley National Bank of Arizona*, 339 F.2d 564 (9th Cir. 1964), or by engaging in a bifurcated analysis of the co-conspirator exception and the sham exception, *see, e. g., Kurek v. Pleasure Driveway & Park District of Peoria, Illinois, supra.* The result of either analysis, of course, would be the same: the conduct of the private parties is infected or invalidated by the illegal conduct of the public officials, thereby precluding the private parties from invoking *Noerr-Pennington* immunity.

**23.** At trial various of the elected representatives who participated in the selection process indicated that they have little, if any, comprehensive knowledge of cable television systems. Indeed, the record without exception reflects that the Mayor and council really never cared to obtain such knowledge; instead they preferred to place their imprimatur on the substantive aspects of a proposal agreed upon by the favored applicants.

the promises made by applicants during the franchise process. The City of Houston did not do that, and in the expert's opinion, the City now cannot enforce the promises the applicants made either to City Council or in their applications. As a result of the kinds of activities identified above, the City received and reviewed applications, all of which were below standard in Malarkey's opinion.

With that background, the Court will proceed to identify the activities of public officials in Houston which clearly demonstrate that the City and McConn participated in the conspiracy. Much of the same evidence previously has been recounted in the discussion of liability, at 999–1005, *supra*; however, the Court deems necessary a repetition of that evidence relating solely to the co-conspirator exception. Thereafter, the Court will apply to that evidence the decisions in which various courts have concluded that participation of public officials in the alleged conspiracy precludes the availability of *Noerr-Pennington* immunity.

### 1. Evidence of Official Involvement

In September 1978, Westland made an application for a franchise within the area for which Gulf Coast had applied. One of the persons involved in the Westland group was McConn's attorney and others were his personal friends. In order to ensure Westland's success, McConn called representatives of Gulf Coast to his office in October, informed them that he felt Westland should have a franchise, and instructed them to go out and talk with the Westland group. Testimony of Clive Runnells. Subsequently, Runnells, on behalf of Gulf Coast, met with Westland because he felt that the Mayor's message was "loud and clear" that Westland would get a franchise.

On November 27, 1978, the attorney for Houston Cable sent a final proposed cable television ordinance to the City Attorney, apprising the City Attorney of modifications the applicants had made and setting a timetable for any further revisions. Plaintiff's Exhibit 29. The next day, Houston Cable's attorney sent copies of the ordi-

nances to the ultimately successful applicants. The proposed ordinances were identical in all material respects and were complete except for the names of the applicants and their proposed service area. Plaintiff's Exhibits 32 & 189. The successful applicants then filled in the blanks with their names and service areas, and forwarded the ordinances to the City Attorney. Some applicants sent their proposed ordinances back to the Houston Cable Attorney who then forwarded them to the City. Plaintiff's Exhibit 35.

The agenda for the City Council meeting of November 29, 1978 contained six (6) cable television franchises, not including plaintiff's, Plaintiff's Exhibit 33. When Affiliated attorney Levin heard of this, he contacted Assistant City Attorney Adrian Baer. Baer told Levin that the Mayor and City Council already had decided. Baer further told Levin, "I learned this directly from the Mayor, the franchises are non-exclusive, he does not know about the areas, it's still being worked out by Williams and Baer . . . so the net result will be a de facto exclusive." Baer also explained to Levin that the decisions as to who was going to get what areas, specifically in terms of the actual boundaries, were still under negotiation, but the decision as to who was fait accompli. Testimony of Al Levin; Plaintiff's Exhibit 106.

After an on-site inspection of Gulf Coast's facilities, the consultant hired by the City told two City officials that he would reject Gulf Coast's application. The next morning, the consultant was fired and subsequently his notes concerning the applications were picked up by a messenger from the City. The consultant had recommended in his report that Gulf Coast be given a smaller franchise area than that for which it had applied. When his notes were typed by someone in the City, that recommendation was deleted. Moreover, other significant changes were reflected in the typed version of the notes he had turned over to the City's messenger: his recommendations that Houston Community Cable, Houston Cable, and Columbia (Westland) be rejected

were changed to recommendations that they should continue to be considered; and his statement that Cablecom had presented the only satisfactory application was omitted. Testimony of Robert Sadowski.

Prior to the plaintiff's hearing before City Council on December 12, 1978, McConn suggested to Goldberg that Affiliated seek a franchise in another area of the City rather than in the area sought by Gulf Coast. McConn testified as to his motivation for the suggestion: "I thought that, in trying to really help Mr. Goldberg, it was pretty obvious to me that Gulf Coast had the muscle and that Mr. Goldberg did not."

At the City Council hearing on plaintiff's application, which was conducted on December 12, 1978, Councilman Goyen addressed the following remarks to Goldberg: "I do not want to taketh away and giveth to somebody else, because I haven't had to do that in the past. You have a very competent attorney, and the other people have very competent attorneys. What I would like to see done, and it might take a motion to get this done, is to send this to the Legal Department and try to work something out." Plaintiff's Exhibit 150 at 27–28. Subsequently, Councilman Mann made the following suggestion: "I want to make a substitute motion that the [plaintiff's] application be referred to the Legal Department, and they in turn can contact these other applicants who have come forward and see if they can work out something." Plaintiff's Exhibit 150 at 37. Also at that hearing, Mann indicated his knowledge of a house-count survey that had been conducted by Gulf Coast in conjunction with a proposal by Gulf Coast that if Houston Cable would give a certain area to Gulf Coast, then Gulf Coast would be willing to give plaintiff its area. Testimony of Al Levin. A document, prepared sometime between November 28, 1978 and December 20, 1978, by Baer contains an alternative boundary description for the Gulf Coast franchise which includes the Houston Cable area, and has Baer's notation as follows: "I–10 line shifted to Hwy. 290 without Goldberg's tract—contingency." Plaintiff's Exhibit 56.

Mayor McConn testified that he ultimately voted in favor of Gulf Coast, which vote effectively precluded plaintiff's being successful, in order to keep certain influential political groups content. Councilman Goyen testified by deposition that he would have voted for Affiliated Capital's application if "on the 20th, Mr. Goldberg had come in and Mr. Runnells had come in, Mr. Mischer had come in, and all the principals had come in, and a piece of Houston had been carved out for Mr. Goldberg with no objection by anybody." Councilman Robinson testified that he would have supported Affiliated Capital's application if plaintiff had been able to work something out with Gulf Coast to give plaintiff what it wanted. Councilman Westmoreland testified that he did not disagree with his prior deposition testimony that Affiliated had been unable to work out any type of arrangement with Gulf Coast, and for that reason he voted in favor of Gulf Coast.

The public officials' acknowledged motivations prompted them to instruct plaintiff to try to negotiate with the other applicants, which actions, in the view of this Court, constitute more than mere acquiescence in private conspirators' plans or mere support of private parties' efforts to induce favorable legislative results. The actions of Mayor McConn were those of an active co-conspirator not content merely to accede to the wishes of private parties. In addition, the actions of the councilmen and other agents of the City demonstrate the City's vigorous involvement in orchestrating certain aspects of the conspiracy.

### 2. Legal Basis for the Co-Conspirator Exception

The rulings of the Supreme Court in *Noerr* and *Pennington* were derived from fact situations involving private parties who allegedly had conspired to induce governmental action. Neither case involved an allegation that any governmental entity or official had participated in or acted to promote the conspiracy. Accordingly, this Court must look to the progeny of *Noerr* and *Pennington* not only to determine the

viability of an exception arising out of a public official's being a co-conspirator but also to define the contours of such an exception.

In *Harman v. Valley National Bank of Arizona*, 339 F.2d 564 (9th Cir. 1964), the Court considered the sufficiency of the allegations contained in plaintiff's complaint, and reversed the district court's dismissal of the complaint. In discussing the validity of defendants' *Noerr* contentions, the Court found that *Noerr* would not necessarily preclude the applicability of the Sherman Act on two grounds: (1) the petitioning activities were alleged to be but one element in a larger scheme; and (2) the acts of the State Attorney General were alleged to be those of a participating conspirator. *Id.* at 566. For the second ground, the Court relied on the question reserved by the United States Supreme Court in *Parker v. Brown*, 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1942) concerning whether the state action exemption to the Sherman Act would apply if the state or its municipality participated in a conspiracy, and concluded that the *Noerr* Court had not held that the Act would be inapplicable in such a situation. The *Pennington* Court subsequently has ruled that joint efforts to petition a public official are not violative of the antitrust laws even when they are part of a larger, illegal scheme. Accordingly, to the extent that the *Harman* Court held to the contrary, its decision no longer is good authority. The second ground relied on in *Harman*, however, remains viable in the view of this Court.[24]

In *Duke & Company, Inc. v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975), the plaintiff alleged that three municipal corporations, three private corporations and one individual, sued both individually and in his official capacity as a county commissioner, entered into an agreement to boycott malt beverages manufactured by plaintiff in the municipal facilities operated by defendants. The district court dismissed the complaint against the three municipal corporations and the individual in his official capacity, pursuant to the authority of *Parker, Noerr* and *Pennington*. The Third Circuit concluded that defendants were not entitled to a state action exemption pursuant to *Parker*, and in ruling that *Noerr-Pennington* immunity also was unavailable to the official and entity defendants, the Court concluded the following:

> In neither [*Noerr* nor *Pennington*] was it alleged that the governmental entity had collaborated to promote the conspiracy. Where the complaint goes beyond mere allegations of official persuasion by anticompetitive lobbying and claims official participation with private individuals in a

**24.** Five years after *Harman*, the Ninth Circuit had occasion to affirm a summary judgment for private-party defendants in a case which involved, *inter alia*, allegations that county commissioners had participated in a conspiracy resulting in the award to one defendant of an exclusive garbage collection franchise by the county commission. *Sun Valley Disposal Company, Inc. v. Silver State Disposal Company*, 420 F.2d 341 (9th Cir. 1969). Plaintiff had relied on two cases, including *Harman*, in support of the co-conspirator exception which it urged. The *Sun Valley* Court remarked on the erosion of the first prong of *Harman* by the subsequent *Pennington* decision; however, the Court did not overrule *Harman* or even comment specifically on the co-conspirator prong of that case. The concurring Judge opined that the co-conspirator prong of *Harman* was not affected by *Pennington*, and that plaintiff simply had failed to identify enough facts to create a disputed issue. *Id.* at 344 (Browning, J., concurring in part).

In distinguishing the other case upon which plaintiff relied, however, the *Sun Valley* majority observed that "government units . . . are seldom free from personal interest and outside influences, but the Sherman Act was not intended to regulate this type of activity. There is support for this view in that *Noerr* . . . holds that so long as the official's action is itself lawful, the action is without the scope of the federal antitrust laws even if the motive for the action was a personal one." *Id.* at 342. Preliminarily, this Court observes that the evidence herein demonstrates clearly that this case involved more than the officials' having personal interests and being influenced by outsiders. Secondarily, inasmuch as the discussion on a public official being a co-conspirator was not dispositive of the Court's ruling in *Sun Valley*, this Court is not persuaded that the co-conspirator ground of *Harman* is no longer good authority.

scheme to restrain trade, the *Noerr-Pennington* doctrine is inapplicable. *See Harman v. Valley National Bank of Arizona*, 339 F.2d 564 (9th Cir. 1964).

*Parker* reserved judgment on such an alleged combination of public and private entities. After *Goldfarb* [*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572] however, it is clear that when there is an allegation of governmental participation in such a combination to the benefit or detriment of private parties, and when the activities of the public body are not compelled by the state acting as a sovereign, a claim has been stated under the antitrust laws. No protection is afforded to such a combination under the doctrine of *Noerr-Pennington*.

We conclude that the allegations of the complaint state an antitrust claim against these defendants despite their governmental status.

*Id.* at 1282 (emphasis in original) (footnote omitted).[25]

In *Kurek v. Pleasure Driveway & Park District of Peoria, Illinois*, 557 F.2d 580 (7th Cir. 1977), *vacated and remanded*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *reinstated*, 583 F.2d 378 (7th Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979), the Court reviewed, *inter alia*, the sufficiency of one count of plaintiffs' complaint which contained allegations that the park district, a unit of local government, had agreed with a private-party potential concessionaire that said concessionaire would make an economically unrealistic proposal for concession rights at five municipal golf courses. Plaintiffs, who had been concessionaires at the golf courses, alleged that the proposal was used to coerce them into a five percent sales taxing, and a price raising/fixing scheme. Plaintiffs alleged that they refused to be coerced and subsequently lost their leases and concessions. Thereafter the co-conspirator concessionaire was awarded concession rights at all five golf courses.

The concessionaire defendant invoked *Noerr-Pennington* immunity, claiming that its role in the case was nothing more than that of a successful bidder. The *Kurek* Court distinguished the decision in *Metro Cable Company v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975), and concluded that if plaintiffs could prove their allegations, *Noerr-Pennington* would provide no defense. First, the *Kurek* Court found that the actions of the concessionaire in presenting the proposal knowing that it would be used by the park district to coerce plaintiffs into conduct violative of the antitrust laws were "not essentially dissimilar to activities the Sherman Act was meant to proscribe." 557 F.2d at 593.

Second, the Court observed the following:

Nor is the fact that [the concessionaire] combined or conspired with governmental officials dispositive, for both of *Noerr*'s premises with respect to that point are undercut by the factual setting of this case. Our determination that the Park District and its officials had no state mandate or authority to engage in the activities attacked here necessarily reduces the applicability of the reasoning of *Noerr* to the degree it is based on the need of governmental units for citizen input in making decisions that *Parker* holds to be outside the scope of the Sherman Act. *See Duke & Company Inc.*, *supra*, 521 F.2d at 1282. The *Noerr* decision also rests on a refusal to impute to Congress an intent to invade the constitutional 'right of the people ... to petition the Government *for a redress of grievances.*' .... We have some difficulty understanding how a contract proposal to a governmental unit falls within the ambit of that right, ... but even if it does, we think it clear that agreement with government officials to pressure others into an antitrust violation does not.

*Id.* at 593–94 (emphasis in original). As a third reason for inapplicability of *Noerr-*

---

**25.** The Third Circuit was analyzing circumstances wherein the governmental entities, rather than the private parties, were claiming *Noerr-Pennington* immunity. This Court, however, concludes that the reasoning in that case also would apply to preclude *Noerr-Pennington* immunity for the private-party defendant herein.

*Pennington*, the Court concluded that plaintiffs possibly could prove that the concession proposal was a mere sham. *Id.* at 594.

Other courts have indicated that the participation of a public official in an illegal conspiracy precludes relief pursuant to the *Noerr-Pennington* doctrine. For example, in overruling an earlier decision of the same court and thereby granting defendants' motions for summary judgment, the Court in *In re Airport Car Rental Antitrust Litigation*, 521 F.Supp. 568 (N.D.Cal.1981), observed that the sham exception to the *Noerr-Pennington* doctrine "may apply where the public officials are themselves participants in the conspiracy." *Id.* at 588 (citation omitted). Plaintiff, a car rental company, alleged that two other car rental companies

> engaged in a conspiracy to eliminate competition in the on-airport rental market and, in furtherance of that conspiracy, jointly influenced and engaged with airport authorities to adopt and enforce certain standards ... regarding eligibility.... [Plaintiff] alleged that those standards and requirements precluded it from competing in the on-airport car rental market [in certain cities]. [Plaintiff] also alleged that defendants entered into contracts with airport authorities which prohibited other car rental operators from entering the ... market and established unreasonably high minimum guarantees, that they opposed applications of other car rental companies in bad faith, and that they fixed rental rates in the on-airport market.

*Id.* at 589 (footnote omitted).

The Court then reviewed the evidence relevant to *Noerr-Pennington* that plaintiff had presented in opposition to defendants' motion for summary judgment:

> Plaintiff ... offers evidence said to show that defendants' representatives coordinated their negotiations with the Port ... and met jointly with Port officials to discuss the terms of the lease agreements ... and to present standards and criteria which the Port should require of lessees, including minimum guarantees....

Among the terms discussed were concession fees, ... [and] criteria which a company should have to meet to provide airport service.... Finally, defendants participated in a series of meetings with Port officials in which they unsuccessfully opposed on economic grounds the entry of additional car rental companies into the on-airport market.

*Id.* at 588. The Court then summarized what plaintiff had demonstrated by its evidence and concluded that *Noerr-Pennington* was applicable:

> a trier of fact could find that defendants, separately and jointly, negotiated with the Port over the various terms of the lease agreements which, as finally executed, required car rental companies ... to meet certain qualifications and pay guaranteed minimum fees, but did not preclude the Port from entering into such agreements with other companies. Even if ... the terms for which defendants negotiated were favorable to them and unfavorable to plaintiff and served to delay plaintiff's entry into this market ... these facts, if they state a claim cognizable under the Sherman Act at all, prove nothing other than a classic case for application of the *Noerr-Pennington* doctrine.

*Id.* at 588–89 (emphasis in original).

This Court acknowledges that *Noerr-Pennington* as applied in the adjudicatory setting permits closer scrutiny of activities than in the legislative setting and allows denial of immunity for actions which would be condoned in the context of the legislative process. *See, e. g., California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972). Those considerations, however, do not preclude the Court from referring to decisions involving adjudicatory processes, for the analyses involved in those decisions can be instructive for the legislative context.

In *Mason City Center Associates v. City of Mason City, Iowa*, 468 F.Supp. 737 (N.D. Iowa 1979), plaintiff alleged that private developers entered into an agreement with

the city to plan a downtown center on the express condition that the city would prevent any person or firm from planning or constructing a regional shopping center that would compete with the downtown center. Plaintiffs sought to construct a center on a tract of land which required rezoning. The city zoning commission denied the application for rezoning and the denial was affirmed by the city council. Plaintiffs alleged that the denial was pursuant to, and in furtherance of, the council members' agreement with the private developers. In denying defendants' motion to dismiss for failure to state a claim, which was based, *inter alia*, on the state action exemption of *Parker*, and the *Noerr-Pennington* doctrine, the Court concluded the following with regard to the applicability of *Noerr-Pennington*:

> to the extent this case presents allegations that the private developers entered into an anticompetitive agreement *with* the City of Mason City and its Council permanently to exclude competing developers from the relevant market, it raises at least one important factual issue relat-

ing to defendants' possible intent or purpose to deprive plaintiffs of any meaningful access to the City's zoning mechanisms and procedures. *See, e. g., California Motor Transport Co. v. Trucking Unlimited, . . . .* On that basis alone this case is distinguishable from *Noerr* and *Pennington.*

*Id.* at 745 (emphasis in original) [26]

In *Federal Prescription Service, Inc. v. American Pharmaceutical Association,* 484 F.Supp. 1195 (D.D.C.1980), a mail order pharmacy alleged that the national association of pharmacists, the only defendant, acting alone or in concert with various named co-conspirators pursuant to anticompetitive policies established by its House of Delegates, restrained plaintiff's interstate sale of prescription drugs by mail. The Court found that the "state agency that sanctioned or initiated [various] anti-competitive activities had, through its membership, consistently expressed economic allegiance to [the association] and opposition to mail order." *Id.* at 1209. Observing that the conduct of administrative officials is

**26.** The *Mason City Center* Court held that a more complete factual record had to be developed before the Court could determine whether "*Noerr-Pennington* political-speech immunity" would preclude plaintiffs' claim. *Mason City Center Associates v. City of Mason City, Iowa,* 468 F.Supp. 737, 745 (N.D. Iowa 1979). The facts of the *Mason City Center* case indicate that the Court therein was analyzing an adjudicatory rather than a legislative process. Further, the Court's reference to "access barring" indicates that the analysis was of an adjudicatory process, inasmuch as most courts have confined the use of that term and concept to an adjudicatory rather than a legislative/executive setting. *See, e. g., California Motor Transport Company v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Mark Aero, Inc. v. Trans World Airlines,* 580 F.2d 288 (8th Cir. 1978); *Federal Prescription Service, Inc. v. American Pharmaceutical Association,* 484 F.Supp. 1195 (D.D.C.1980); *Wilmorite, Inc. v. Eagan Real Estate, Inc.,* 454 F.Supp. 1124 (N.D.N.Y.1977), *aff'd,* 578 F.2d 1372 (2d Cir. 1978), *cert. denied,* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978). *Cf. Metro Cable Company v. CATV of Rockford, Inc.,* 516 F.2d 220, 231–32 (7th Cir. 1975) (Court engaged in an analysis of "access-barring" in the context of the legislative process).

Although "access-barring" well might constitute an appropriate method of analysis in cases involving legislative action, this Court need not engage in such an analysis in order to reach the conclusion that the facts herein bring the instant cause within the co-conspirator exception. This Court, however, finds the *Mason City Center* reasoning particularly instructive in spite of the different context and the different method by which that Court reached its result. Two reasons exist for this Court's reliance on the *Mason City Center* reasoning concerning the co-conspirator exception: (1) the function of the city council in that case in affirming the action of the zoning commission was very similar to the function of the Houston City Council during the franchising process; and (2) in support of its decision about the applicability of *Noerr-Pennington,* that Court cited several cases involving the legislative/executive context as well as those it cited wherein the alleged scheme had involved the courts or administrative bodies. Although the standard for determining whether certain activities involving the courts or administrative decisionmakers constitute corruption of those bodies is less strict than the standard which is applied to similar activities designed to induce legislative action, corruption of legislative bodies is not eliminated as a consideration when a court must decide whether *Noerr-Pennington* applies.

subject to closer scrutiny than that of state legislators, and that conduct is less protected when the focus of administrative decisionmaking shifts to discretionary judgments concerning commercial considerations, the Court concluded that "[b]ecause the ... Board itself was part of the illegal conspiracy its administrative processes could not be invoked or applied fairly ... with respect to [plaintiff's business]." Further, the Court found that, "as a consequence the challenged Board action is tainted as a sham." *Id.* at 1209 (citations omitted).

In *Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272 (D.C. Cir. 1972), plaintiffs asserted that the defendants conspired to keep plaintiffs' drug ... off the interstate market and out of competition with ... a similar drug sold by defendants Baxter and Travenol, by influencing the Food and Drug Administration to deny fair consideration of the new drug applications filed by plaintiffs.... that defendants (who include an official of the FDA) carried out this conspiracy by suppressing, concealing and misconstruing information concerning the two drugs before the FDA; by arranging for the employment as a consultant to the FDA of a medical doctor who had a financial interest in Baxter, ...; by applying an unfair standard in judging [plaintiffs' drug]; and by misrepresenting the safety and efficacy of [plaintiffs' drug].

*Id.* at 274.

In the context of defendants' *Noerr-Pennington* contentions, the Court observed that plaintiffs had alleged "that the real purpose of defendants' joint efforts is to preclude, not induce, fair FDA consideration of the safety and efficacy of plaintiffs' drug ..., and as such should be viewed as falling within the 'sham' exception to *Noerr-Pennington.*" *Id.* at 279. Pursuant to its obligation to take all of the allegations in the complaint as true, the Court remanded all issues to the district court.

Having analyzed the above-identified decisions and compared the facts thereof to the evidence presented in the instant cause,

the Court concludes that the co-conspirator exception to *Noerr-Pennington* is applicable herein to deny immunity to Gulf Coast. The activities of the Mayor, various members of City Council and employees of the City amply demonstrate that the Houston franchising process involved more than successful petitioning efforts by private parties who persuaded public officials to support them. The evidence herein reveals active participation, and orchestration by public officials in an anticompetitive agreement.

In asserting that *Noerr-Pennington* immunity applies to the facts of this case, defendants rely primarily on the decision in *Metro Cable Company v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975). This Court perceives as necessary a detailed analysis of that case in order to demonstrate that the ruling therein is not dispositive of the finding by this Court that the co-conspirator exception precludes the applicability of *Noerr-Pennington.*

The Seventh Circuit affirmed the dismissal of plaintiff's second amended complaint on the basis of the *Noerr-Pennington* doctrine. Plaintiff, a cable television company which applied for and failed to receive a franchise in Rockford, sued the following: (1) the company which did get the franchise, CATV; (2) CATV's affiliate which operates WCEE–TV in Rockford; (3) four individuals associated with those companies; and (4) the mayor and an alderman of the city. In substance, plaintiff alleged the following:

WCEE–TV and its officers planned to obtain the exclusive cable television franchise in Rockford; organized a company, CATV, for that purpose; induced the mayor and an alderman to oppose plaintiff's application by making a campaign contribution to each of those officers; and succeeded, with the help of the mayor and the alderman, in persuading the city council not only to award the franchise to CATV but to refuse plaintiff's successive applications without affording plaintiff a hearing.

516 F.2d at 224.

Having recounted the material facts and analyzed the reasoning of the major Su-

preme Court decisions pertinent to the immunity issue before it, the Seventh Circuit concluded that those decisions could be synthesized as follows:

> The Sherman Act does not apply to otherwise valid governmental action that results in a restraint of trade or monopoly. *Parker v. Brown.* Nor does the Sherman Act apply to concerted efforts to induce government to take such lawful action, if those efforts are genuine. *Noerr.* Such efforts constitute political activities which Congress did not intend to regulate by the Sherman Act. This is true even though the purpose and effect of the concerted activities is to eliminate competition. *Noerr; Pennington.* When the concerted activities occur in a legislative or other non-adjudicatory governmental setting, they are not within the Sherman Act even though they include 'conduct that can be termed unethical,' such as deception and misrepresentation. *Noerr; Pennington.* This is true even when the concerted efforts are 'part of a broader scheme itself violative of the Sherman Act.' *Pennington.* When, however, the concerted activities occur in an adjudicatory setting, unethical conduct that would not result in antitrust illegality in a legislative or other non-adjudicatory setting may demonstrate that the defendants' activities are not genuine attempts to use the adjudicative process legitimately and may therefore result in illegality, including illegality under the antitrust laws. (This is 'the "sham" exception in the *Noerr* case, as adapted to the adjudicatory process.' 404 U.S. at 516, 92 S.Ct. at 614.) *California Motor Transport.*

*Id.* at 227–28 (emphases in original).

The Court then discussed the plaintiff's allegations that the mayor and the alderman had participated as co-conspirators and determined that such allegations would not suffice to take the case outside of the scope of *Noerr-Pennington.* Distinguishing *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942) by finding that the case before it was not one "in which the agency of the government itself is alleged to be part of the conspiracy...", 516 F.2d at 229, and recognizing that *Pennington* involved the act of a public official who was not claimed to be a co-conspirator, the Seventh Circuit concluded that, even in light of plaintiff's allegation that the mayor and alderman had received substantial sums as campaign contributions in exchange for their support:

> Nothing in the *Noerr* opinion or any other case of which we are aware suggests any reason for believing that Congress, not having intended the Sherman Act to apply to combined efforts to induce legislative action, did intend the Act to apply if a member of the legislative body agreed to support those efforts.

*Id.* at 230 (emphasis in original).

This Court acknowledges that the franchise applicants in Houston could have conspired among themselves to petition the City for legislative action favorable to them even if their purpose had been to eliminate or limit competition from others not subscribing to their joint efforts. The evidence before this Court, however, encompasses much more than such petitioning activities on the part of private parties. Indeed, said evidence presents more than public officials' mere support of the efforts of private parties, public officials' unethical conduct, or the alleged participation of public officials in a conspiracy simply through their influence in favor of private parties on the legislative body taking the action. The evidence presented herein demonstrates clearly that the Mayor and the City itself, through the conduct of its agents and employees, not only supported the lobbying efforts of Gulf Coast and communicated with applicants about franchise terms, *see In re Airport Car Rental Antitrust Litigation, supra,* at 589, but also manipulated certain aspects of the conspiracy. The facts of this case exceed those considered by the *Pennington* and *Metro Cable* courts; for, herein are presented not only allegations but proof by a preponderance of the evidence that a public official and a governmental entity actively

conspired with private participants in violations of the Sherman Act.[27]

### B. State Action Exemption and Legislative Process Immunity

Two corollary doctrines which could be relied upon by the governmental defendants are the state action exemption derived from *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942) and its progeny, and legislative process immunity derived from such decisions as *Duke & Company, Inc. v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975). With regard to immunity arising out of public officials' functioning within the legislative process, the jury was instructed, in part, as follows:

> Lawful activities of such a legislative body, or lawful activities of individual members of such a legislative body, or of employees providing administrative assistance to such a legislative body are not activities prohibited by the antitrust laws when such lawful activities are part of or occur in the course of the legislative process.

Instruction No. 19. In answering Interrogatory No. 3 affirmatively, and finding in Interrogatory No. 4 that the City and McConn were liable, the jury clearly determined that the acts committed by or on behalf of those defendants were outside of the scope of the legislative process.

This Court concludes that the record amply supports that jury finding. The *Duke* Court observed that the proposition that "*Noerr-Pennington* immunity covers a state governmental entity which 'listens to anticompetitive pleas' [d]oubtlessly ... is correct so long as the public body acts within its legal discretion and in what it considers the public interest." 521 F.2d at 1282.

This Court's analysis below of the requisites of the *Parker* state action exemption demonstrates that pursuant to state law, the City of Houston had the right not only to engage in the cable television franchising process, but also to award franchises. That authority alone, however, does not suffice to meet the standard prescribed by the *Duke* Court.

What becomes most strikingly apparent in the record of the Houston franchising process is that the interests of or benefits to the citizens of Houston who would receive cable television services was of minimal, if any, concern to the Houston City Council or to the Mayor. The council's unwillingness to assess the applications prior to approving them cannot be characterized as being in the public interest. Further, the acts of members of council and the Mayor are not deemed by this Court to be either within the intent of the State legislature or within the actors' legal discretion. Thus, the criteria for legislative process immunity are not satisfied. Further, inasmuch as the evidence clearly reveals that McConn acted outside of the scope of his responsibilities as a city official by actively participating in the agreement to ensure the failure of non-conspirators, this Court is compelled to deny him any individual immunity.

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942), the Supreme Court held that the antitrust laws were not intended to apply to state action, thus creating an exemption for certain state decisions and actions resulting in restraint of trade or monopoly. The *Parker* doctrine as well exempts "anticompetitive conduct engaged in as an act of government by ... subdivisions [of the State], pursuant to state policy to displace competition with regulation or

---

**27.** In *Parmelee Transportation Company v. Keeshin*, 292 F.2d 794 (7th Cir. 1961) the Court affirmed the district court's granting of defendants' motions for summary judgment, finding, *inter alia*, that plaintiff's allegation that wrongful conduct on the part of a member of the Interstate Commerce Commission facilitated plaintiff's competitor in receiving a monopoly baggage-transfer contract from the railroads did not allege a violation of the antitrust laws. The Court in *Cow Palace, Ltd. v. Associated Milk Producers, Inc.*, 390 F.Supp. 696 (D.Colo. 1975), granted defendant's motion to dismiss, finding that plaintiff's allegation that the alleged conspiracy included representatives of the United States government was insufficient to preclude applicability of *Noerr-Pennington* because the Ninth Circuit had disapproved its decision in *Harman v. Valley National Bank of Arizona*, 339 F.2d 564, a case primarily relied upon by plaintiff.

monopoly public service." *Lafayette v. Louisiana Power & Light Company*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978). The City raised the *Parker* state action doctrine in various pretrial motions, but has not reurged its applicability in the post-trial motions now being considered. The Court, however, deems necessary an analysis of the City's position pursuant to *Parker* because a synthesis of the many decisions reviewed hereinabove indicates that a relationship exists between the availability of *Noerr-Pennington* immunity and the validity of the state, or state subdivision, action involved.

The *Parker* Court reserved the question of the availability of its exemption when the governmental entity itself is alleged or proven to be a co-conspirator with private parties: "[W]e have no question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade, ...." *Parker*, 317 U.S. at 351–52, 63 S.Ct. at 314. Various courts have emphasized that unresolved issue of *Parker* in analyzing the applicability of *Noerr-Pennington* political activity immunity. *See, e. g., Kurek v. Pleasure Driveway & Park District of Peoria, Illinois, supra; Duke & Company v. Foerster, supra; but see, Harman v. Valley National Bank of Arizona, supra*, wherein the Court observed that making "Sherman Act liability depend upon ultimate resolution of often difficult questions of law and fact relating to the validity or propriety of solicited governmental action 'would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade' and 'would raise important constitutional questions' ...." *Id.* at 566, quoting *Noerr*, 365 U.S. at 137–38, 81 S.Ct. at 529–530; *In re Airport Car Rental Antitrust Litigation, supra.*

The *Noerr* Court itself observed that "where a restraint upon trade ... is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." 365 U.S. at 136, 81 S.Ct. at 529, citing *United States v. Rock Royal Co-op, Inc.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; *Parker v. Brown, supra.* Further, the dual underpinnings of the *Noerr* decision demonstrate the Supreme Court's recognition of the interplay between the government's right to represent the people and its concomitant need to receive information from its constituency, and the people's right freely to inform the government of their wishes. *Noerr*, 365 U.S. at 137 & n.17, 81 S.Ct. at 529 & n.17. Thus, *Noerr* was based not only on First Amendment considerations, but also on the concept confirmed in *Parker*. *See, e. g., Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124, 1136 (N.D.N.Y.1977), *aff'd*, 578 F.2d 1372 (2d Cir. 1978), *cert. denied*, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978).

The Third Circuit, in *Duke & Company v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975), reasoned as follows:

> *Parker* reserved judgment on such an alleged combination of public and private entities. After *Goldfarb*, however, it is clear that when there is an allegation of governmental participation in such a combination to the benefit or detriment of private parties, and when the activities of the public body are not compelled by the state acting as sovereign, a claim has been stated under the antitrust laws. No protection is afforded to such a combination under the doctrine of *Noerr-Pennington*.

*Id.* at 1282 (emphasis in original). In finding that plaintiff's allegations that two public officials had participated in a conspiracy in violation of the Sherman Act were insufficient to preclude applicability of *Noerr-Pennington*, the Seventh Circuit, in *Metro Cable*, observed that the case before it was not one "in which the agency of government itself is alleged to be part of the conspiracy, the question reserved in *Parker v. Brown*...." *Metro Cable Company v. CATV of Rockford, Inc.*, 516 F.2d 220, 229 (7th Cir. 1975).

This Court interprets the decisions rendered pursuant to the authority of *Noerr, Pennington* and *Parker* as suggest-

ing the following result. When a restraint of trade is the result of valid governmental action which was induced by the joint efforts of private parties, those joint efforts are shielded by *Noerr-Pennington* immunity. When, however, the governmental action is rendered invalid by the illegal, not merely unethical, conduct of the governmental entity acting as a co-conspirator, the joint efforts of the private parties are not automatically entitled to immunity. Further, inasmuch as the governmental entity can act only through its agents, who are public officials, the illegal acts of those officials in their official capacities become the illegal acts of the entity.

■ If participation of the entity in a conspiracy taints the petitioning process, the same conduct of the entity's agents necessarily must taint the process. Where municipalities, or their agents acting in official capacities, are proven, along with private parties, to have engaged in a conspiracy in restraint of trade, the result is that the actions which the private parties sought to induce were unlawful and therefore rendered at least invalid if not non-governmental. *See In re Airport Car Rental Antitrust Litigation, supra,* at 587 where the Court made the following observation:

> This is not a case in which the agencies themselves are charged with having engaged in activities violating the antitrust laws. It must be distinguished from the cases in which the municipalities along with private parties were alleged to have engaged in exclusionary activities. . . . In those cases the governmental character of the activity under *Parker v. Brown* and *Lafayette* was critical to the application of the antitrust laws to the public agencies. No such issue is present here. Plaintiff has made no showing that the public agencies' actions defendants sought to induce were, or would have been unlawful in themselves and therefore not governmental.

*Id.* at 587 (citations and footnote omitted).

The *Noerr* Court found that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr,* 365 U.S. at 136, 81 S.Ct. at 529. In part, the Court so concluded because a contrary interpretation of the Act "would substantially impair the power of government to take actions through its legislature . . . that operate to restrain trade", *id.* at 137, 81 S.Ct. at 529, for the reason that governments acting on behalf of the people rely on the people being able freely to inform the government of their wishes. Thus, the *Noerr* Court established a nexus between the exemption for valid governmental actions in restraint of trade pursuant to *Parker* and the people's protected right to petition the government for such actions pursuant to *Noerr,* and subsequently *Pennington.*

■ In the case before this Court, the awarding of the franchises is a power accorded to the Houston City Council pursuant to State law, and that ultimate action is not challenged. That ultimate action was not rendered non-governmental by the actions of defendants herein. The conduct of defendants during the franchising process, however, was illegal, and, therefore, this Court concludes that the legislative action sought by the private parties was rendered invalid by that illegal conduct. Accordingly, the first underpinning of *Noerr* is weakened; the participation of the public officials in the illegal conspiracy resulted in the private parties' petitioning to induce invalid governmental action. The circumstances of this case do not present the unfairness to petitioning parties, or the uncertainty of result for persons attempting to persuade governmental bodies that concerned the courts in *Harman v. Valley National Bank of Arizona, supra,* at 566, and *In re Airport Car Rental Antitrust Litigation, supra,* at 586. This Court perceives no injustice in depriving Gulf Coast of *Noerr-Pennington* immunity on facts which demonstrate not only that public officials actively participated in an illegal conspiracy but also that the private parties involved were aware of and sought such participation.

Defendants have asserted that the two doctrines, *Parker* and *Noerr-Pennington*, are not interdependent. That view finds support in the decisions rendered by the *Harman* Court and the *In re Airport Car Rental Antitrust Litigation* Court. This Court, however, believes that the concerns of those courts are not instructive of the circumstances of this case, as explained hereinabove. Further, defendants' assertion does not satisfactorily consider the unresolved question in *Pennington* regarding a public official who is alleged to be a co-conspirator. As this Court has explained previously, the conduct of a public official acting in his or her official capacity becomes the conduct of the entity. Accordingly, the unresolved question in *Pennington* can be viewed, in certain circumstances, as coextensive with the question reserved by the *Parker* Court concerning the import of co-conspirator activities on the part of a state or its municipality. *See Parker*, 317 U.S. at 351–52, 63 S.Ct. at 313–314.

Even if defendants are correct, however, the determination of whether municipal action is exempt from antitrust liability pursuant to *Parker* is pertinent to whether the private parties seeking such action may invoke *Noerr-Pennington* immunity. Assuming that *Noerr-Pennington* immunity for private parties is not contingent on the governmental action's being exempt pursuant to *Parker*, at the very least, the involvement of public officials in an illegal agreement "reduces the applicability of the reasoning of *Noerr* to the degree it is based on the need of governmental units for citizen input in making decisions that *Parker* holds to be outside the scope of the Sherman Act." *Kurek v. Pleasure Driveway & Park District of Peoria, Illinois, supra*, at 593.

Accordingly, this Court engages in the following analysis of the state action exemption pursuant to *Parker* to demonstrate that the City's actions during the franchising process are not encompassed by that exemption.[28]

Pursuant to *Lafayette v. Louisiana Power & Light Company, supra*, a subdivision of the State, such as the City of Houston, may claim exemption from antitrust liability on the authority of *Parker*. Inasmuch as "subordinate units of [state] government ... are not entitled to all of the federalistic deference that the state would receive", *Kurek v. Pleasure Driveway & Park District of Peoria, Illinois, supra*, at 589, courts have engaged in case-by-case analyses to determine the applicability of the state action doctrine to various governmental actions or laws and certain tests have emerged. *See, e. g., California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *Lafayette v. Louisiana Power & Light Company, supra; Cantor v. Detroit Edison Company*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).

The decisions reveal that different standards have been applied to private parties claiming state action exemption and to municipalities claiming such exemption from antitrust liability. *Compare Cantor v. Detroit Edison Company, supra with Lafayette v. Louisiana Power & Light Company, supra*. Any assertion that Gulf Coast would have made regarding the applicability to it of *Parker* immunity clearly would have been foreclosed by the requirement that a private party must show that anticompetitive activities were "compelled by

---

28. An unresolved question exists regarding whether the *Parker* doctrine "would protect not only the state itself, but private parties acting under state mandate." *United States v. Southern Motor Carriers Rate Conference, Inc.*, 467 F.Supp. 471, 479 (N.D.Ga.1979). *See Cantor v. Detroit Edison Company*, 428 U.S. 579, 594–95, 96 S.Ct. 3110, 3119–3120, 49 L.Ed.2d 1141 (1976) (plurality opinion) wherein the Court left open the availability of a *Parker* exemption to private parties in "cases in which the State's participation in a decision is so dominant that

it would be unfair to hold a private party responsible for his conduct in implementing it, ...." *Id.* at 594–95, 96 S.Ct. at 3119. In this case, Gulf Coast has not contended that it is entitled to an exemption pursuant to *Parker*. The Court, however, briefly has analyzed the decisions pertaining to the *Parker* exemption for private parties in order to demonstrate that Gulf Coast could not have availed itself of that exemption on the record developed at trial. Refer to discussion at 1026–1027, *supra*.

direction of the State acting as a sovereign." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975); *see also, Cantor v. Detroit Edison Company, supra; United States v. Southern Motor Carriers Conference, Inc.*, 467 F.Supp. 471, 481–83 (N.D.Ga.1979); *cf. California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., supra*, 445 U.S. at 105, 100 S.Ct. at 943 (in deciding that the state plan for wine pricing was not protected state action, the Court articulated a two-pronged standard for *Parker* antitrust immunity: "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy' [and] the policy must be 'actively supervised' by the State itself.") *Id.* at 105, 100 S.Ct. at 943, quoting *Lafayette v. Louisiana Power & Light Company, supra*, 435 U.S. at 410, 98 S.Ct. at 1135, 100 S.Ct. at 943. Thus, on the facts of the instant case, Gulf Coast could not have satisfied the standard of *Goldfarb* or of *California Liquor. See also Guthrie v. Genesee County, New York*, 494 F.Supp. 950, 958 (W.D.N.Y. 1980) ("if the County itself cannot claim to be 'exempt' from the antitrust laws by virtue of its status, the *a fortiori* [the private party] has no greater claim to the state action exemption ..., especially since it is alleged that [the private party] and the County ... have engaged in the same conduct.") *Id.* at 958 (emphasis in original); *cf. Wiggins Airways, Inc. v. Massachusetts Port Authority*, 362 F.2d 52, 56 (1st Cir. 1966), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966). (In deciding that the Authority was an instrumentality of the government and exempt pursuant to *Parker*, the Court remarked as to the private-party defendants that "If, as we have found, the Authority's conduct was lawful here, it would be an unreasonable restriction on its freedom to hold that the other defendants acted illegally in having aided it." *Id.* at 56).

The determination of whether the City of Houston, as a subordinate unit of State government, would be entitled to an exemption pursuant to *Parker* requires more comprehensive analysis. The *Lafayette* Court concluded that only anticompetitive conduct that is engaged in by a subdivision of the state pursuant to state policy is exempted by the *Parker* doctrine. *Lafayette v. Louisiana Power & Light Company, supra*, 435 U.S. at 413, 98 S.Ct. at 1136. The Court also emphasized that the state policy must be one "clearly articulated and affirmatively expressed" as such, and that the implementation thereof must be "actively supervised" by the state as policymaker, *id.* at 410, 98 S.Ct. at 1135. The state subdivision, however, need not be able "to point to a specific, detailed legislative authorization", *id.* at 415, 98 S.Ct. at 1138. Instead, "an adequate state mandate for anticompetitive activities of cities ... exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'" *Id.* at 415, 98 S.Ct. at 1138, quoting the Fifth Circuit Court of Appeals in the decision below, 532 F.2d 431, at 434.

Pursuant to Article 11, Section 5 of the Texas Constitution, Houston is a home rule city. In Texas, a home rule city has " 'full power of self-government, that is, full authority to do anything the legislature could theretofore have authorized [it] to do.'" *Lower Colorado River Authority v. City of San Marcos*, 523 S.W.2d 641, 643 (Tex.Sup. Ct.App.1975), quoting *Forwood v. City of Taylor*, 147 Tex. 161, 214 S.W.2d 282. Accordingly, the legislature does not make grants of power to such cities; however, limitations on their powers may derive from general law, the Constitution or the city charter.

As defendant City has pointed out with regard to cable television franchising,

The power to franchise cable television clearly falls within the plenary power granted to the City of Houston under the home rule city amendment. There are no legislative limitations proscribing the power of home rule cities to franchise cable television. In fact, the legislature of the State of Texas has codified this power with an express grant to home rule cities of full franchising power. Tex.Rev. Civ.Stat. Art. 1175, § 12 and Art. 1181.

The only proscription on cable television franchising is set forth by the Texas Constitution which provides that franchises must be non-exclusive and non-perpetual. Texas Constitution, Art. 1 § 17.

The absence of legislative limitations on home rule cities' powers to grant franchises, and even the full power of self government with regard to all matters not otherwise limited cannot render the City of Houston's actions with regard to the cable television franchising process equivalent to those of the state for purposes of a *Parker v. Brown, supra,* exemption from antitrust liability. The "court must examine the state statute which purportedly contains the authorization for the anticompetitive conduct ..." *Guthrie v. Genesee County, New York, supra,* at 955, particularly because "where there are numerous subordinate units of government of a given type, each of the same status under state law, it is more difficult to say that the actions of any one of them are undertaken pursuant to 'the state['s] command,' ... or that '[t]he state ..., as sovereign' imposed any anticompetitive restraints resulting from such actions."[29] *Kurek v. Pleasure Driveway & Park District of Peoria, Illinois, supra,* at 589, quoting *Parker v. Brown, supra,* 317 U.S. at 352, 63 S.Ct. at 314.

The various statutes and constitutional provisions applicable to the cable television franchising issue herein demonstrate no intent on the part of the Texas legislature that the franchising process in home rule cities is to be anticompetitive. The award in other Texas cities of one franchise covering the entire city, rather than multiple, non-overlapping franchises, does not belie this Court's assessment of the legislative intent. The plaintiff's expert testified that such awards were the results of vigorous competition during the franchising processes.

None of the pertinent provisions or statutes reveals clearly and affirmatively an intent to displace "competition with the kind of regulation and monopoly service contemplated by the Supreme Court under the 'state action' doctrine." *Mason City Center Associates v. City of Mason City, Iowa,* 468 F.Supp. 737, 746 (N.D. Iowa 1979). Further, none of the cited provisions indicates that the State actively supervises the implementation of any anticompetitive policy addressed to franchising, even if such a policy could be said to exist. To the contrary, Article 1181 of the Texas statutes gives the exclusive power and authority to make a grant of such a franchise to the governing authority of the home rule city.

The Court concludes that "the numerosity and potential variety of [franchising] practices of [home rule cities] ... suggest that 'the State's policy is neutral' on any given [franchise] practice and that there is no 'statewide program' which would require the sort of comity-based respect evident in *Parker.*" *Kurek v. Pleasure Driveway & Park District of Peoria, Illinois, supra,* at 590, citing *Cantor v. Detroit Edison Company, supra,* 428 U.S. 579, at 585, 96 S.Ct. at 3115 (emphasis in original).

**29.** Home rule cities in Texas include those with populations of 5000 or more, Art. 11, § 5, Texas Constitution, and the Court assumes that numerous cities of that size exist in the State. Plaintiff's expert witness testified that other cities in Texas have engaged in cable television franchising processes different from the process in Houston. As a result of the competition inherent in those franchising processes, the expert testified that the benefits to the citizens of those cities were greater than any benefits derived in Houston.

In light of the number of home rule cities and the various ways in which each could implement or has implemented the statutory franchising authority, the Court can conclude that the Texas legislature intended for home rule cities to have freedom to decide how best to conduct the franchise process. That intent, however, is far afield from the intent urged upon the Court by the City defendant's invocation of *Parker* immunity: that the City of Houston's decision to engage in an anticompetitive process was equivalent to an affirmatively expressed state policy, or was sanctioned by the legislature. This Court declines to decide that the State's grant of full powers of self-government to home rule cities must be viewed as a legislative grant to Houston to implement a "state policy" requiring not only restraint of trade in cable television franchising but also participation of Houston public officials in a conspiracy to restrain trade.

[A]bsent state authority which demonstrates that it is the intent of the state to restrain competition in a given area, *Parker*-type immunity ... may not be extended to anti-competitive government activities. Such an intent may be demonstrated by explicit language in state statutes, or may be inferred from the nature of the powers and duties given to a particular government entity.

*Duke & Company, Inc. v. Foerster, supra*, at 1280 (emphasis in original).

Nothing in the legislative enactments reviewed by this Court indicates either explicitly or implicitly that the intent of the State is either to restrain competition in the cable television franchising process or to direct home rule cities to do so. Nor do the pertinent provisions reveal that the legislature contemplated the kind of activity complained of and proven herein. *See, e. g., Guthrie v. Genesee County, New York, supra.* Accordingly, the Court concludes that the state action exemption doctrine of *Parker* and its progeny is unavailable to the City and to McConn, *see, e. g., Duke & Company, Inc. v. Foerster, supra*, as well as being unavailable to Gulf Coast.

### VI. Conclusion

For the reasons stated hereinabove, the Court hereby orders the following:

(1) plaintiff's Motion for Injunctive Relief and for Entry of Judgment in Accordance with the Verdict is denied;

(2) plaintiff's Motion for Leave to File its Second Amended Complaint is denied;

(3) defendants' motions for judgment on verdict or for new trial are denied; and

(4) defendants' motions for judgment notwithstanding the verdict are granted.

Counsel will present an appropriate final order for entry by the Court within twenty (20) days hereafter.